MICHIGAN STATE TELEPHONE CO. *v.* MICHIGAN
RAILROAD COMMISSION.

1. TELEGRAPHS & TELEPHONES—RAILROAD COMMISSION—ORDERING CONNECTION—VALIDITY OF ORDER.

Under the authority granted to the railroad commission by virtue of the terms of Act No. 206, Pub. Acts 1913, 2 Comp. Laws 1915, § 6689 *et seq.*, the power of the commission to require a physical connection extends only to two or more persons, copartnerships, or corporations operating

telephone lines which can be made to form a continuous
line of communication. It gives the power to order a
physical connection whenever and wherever those lines
by such connection can be made to form a continuous
line of communication whether between the different towns
or between subscribers in the same town.

2. SAME — DUE PROCESS OF LAW — EMINENT DOMAIN — CONSTITU-
TIONAL LAW.

The enforced physical connection between the lines of two
companies would be an exercise of the right of regulation,
and would not amount to such a taking as could only be
justified by the power of eminent domain.

3. SAME—DISCRIMINATION—STATUTE.

The relations of a telephone company in this State are
not simply with its own subscribers, but with the public
generally, and it is forbidden by law to make any dis-
crimination between persons. 2 Comp. Laws 1915, § 6688.

4. SAME—RAILROAD COMMISSION—REASONABLENESS.

Since the regulation of public utilities by the State is
thus, and necessarily, an interference to some extent with
private property, it can be justified only by the demands
of public convenience and necessity, and the regulation
must be reasonable having in view the public interest to
be subserved and the extent of the burden imposed.

5. SAME—NECESSITY—PUBLIC CONVENIENCE.

The statute does not require that the public necessity be
peculiar to the particular case, for the existence of a
public necessity in each particular case is not diminished
by the existence of the same public necessity in all cases;
and, under said Act No. 216, Pub. Acts 1913, 2 Comp.
Laws 1915, §§ 6689-6714, the question whether public con-
venience and necessity require physical connection of com-
peting telephone lines in a particular case is a question
of fact in every instance, the result of competition varying
in different localities. If there is a public need of the
connection the statute is satisfied.

6. SAME—DECREE—CHARGES—EVIDENCE.

*Held*, on an appeal from a decree for the defendant rail-
road commission, in a suit to test the validity of an order
requiring the complainant and Citizens' Telephone Com-
pany to connect their systems for toll line service in
Traverse City, that the needs of the locality justified an
order of the commission to the effect aforesaid and that

its fixing of charges was not an abuse of discretion. The burden was on complainant to show that the connection would inflict undue loss upon it and one that could not be avoided by adjustment of the rates, tolls and charges.

Appeal from Wayne; Van Zile, J. Submitted June 23, 1916. (Docket No. 145.) Decided December 21, 1916.

Bill by the Michigan State Telephone Company against the Michigan Railroad Commission to vacate an order requiring certain physical connections with the Citizens' Telephone Company. From a decree for defendant, complainant appeals. Affirmed.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long,* of counsel), for complainant.

*Grant Fellows,* Attorney General, and *David H. Crowley,* Assistant Attorney General (*Edwin H. Lyon* and *William A. Bahlke,* of counsel), for defendant.

PERSON, J. On the 11th day of June, 1914, the Michigan railroad commission made an order:

"That the Michigan State Telephone Company and the Citizens' Telephone Company, two Michigan corporations, make such a physical connection or connections between their toll lines or systems, in the city of Traverse City as is required for the furnishing of toll line service to the subscribers of each company at the stations installed in their residences and places of business over the toll lines of the other company."

The order was granted upon the petition of certain residents of Traverse City, who are said to represent in their application a large number of their fellow townsmen. Complainant, as one of the companies affected by the order, brings this suit, under the provisions of the statute, asking that it be vacated and set aside.

It appears from the record that both the Michigan State Telephone Company and the Citizens' Telephone Company have exchanges in Traverse City. The Citizens' Company has by far the larger number of local subscribers, 1,740 as against 479 of the Michigan Company, but the latter has the more extensive toll system, and handles a larger number of outgoing and incoming messages. The lines of the latter company not only afford better long-distance facilities, but reach every, or nearly every, city and village in the vicinity of Traverse City, while those of the Citizens' Company fail to reach a number of important neighboring towns. Testimony was given explaining the telephonic connection of Traverse City with the exchanges in about 50 other places in that part of the State. For the purpose of more clearly understanding the situation these places may be roughly divided into three groups.

In the first of these groups, comprising more than half of the places considered, the Michigan Company operates the only exchange now in existence. Formerly there were two exchanges in each of these towns, the one owned and operated by the Michigan Company, and the other by what was known as the Swaverly Company. At that time the Citizens' Company in Traverse City and other so-called independent companies in other places were connected with the exchanges of the Swaverly Company so that the subscribers of the one could talk with the subscribers of the other. About March, 1912, the Michigan Company purchased from the Swaverly Company all of its property and business and united the exchanges of the latter company with its own. But as a condition of the merger it was required by the railroad commission that the Citizens' Company should be allowed to continue the same connection with the exchanges thus consolidated that had before existed with the Swaverly

exchanges. As a result of this requirement the toll lines of the Citizens' Company have continued to be, and are, connected with the switchboards of the consolidated exchanges in all of these Swaverly towns, as we will call them, so that the subscribers of either company in Traverse City are able to talk with the subscribers of the Michigan Company in the 30 or more Swaverly towns as if they were all reached by the same telephone system. In addition to these so-called Swaverly towns, there are a large number of places in the southeastern part of the State, including the city of Detroit, with which the holders of Citizens' telephones have the same kind of connection, and from the same cause. With the towns in this group the present order of the commission will afford no new or additional facilities of communication to the residents of Traverse City.

In the second of the groups into which we have divided the towns around Traverse City, full competition still exists between the two telephone companies. There are in this group about nine cities and villages, and between these towns and Traverse City the Michigan Company and the Citizens' Company has each its own toll line, and in them each maintains its own exchange. As between Traverse City and these towns the subscribers of one company cannot talk from their own telephones with the subscribers of the other, and will not be able to do so unless the physical connection is made between the lines of the two companies as required by the order of the railroad commission.

The third group is also composed of some nine or ten towns, and includes places of considerable importance. In these towns the Michigan Company has the only exchanges and its toll lines are the only ones connecting them with Traverse City. With the residents of these towns the subscribers of the Citizens' Company in Traverse City have no telephonic communica-

tion except by becoming subscribers of the Michigan Company, or by going to the public stations of that company.

Traverse City, according to the census of 1910, has a population of more than 12,000. It has wholesale and jobbing concerns patronized by merchants of surrounding communities. And it is the site of the Traverse City State Hospital for the Insane, which receives patients from the thirty-seven counties of the northern portion of the lower peninsula. The business men of the city must necessarily have telephonic communication, not only with residents of the city, who mostly use the Citizens' telephone, but also with towns of the third group, which can be reached only over the lines of the Michigan Company. This forces a duplication of instruments, and there are 188 subscribers in the city who feel obliged to, and do, keep both telephones. And in asking for the order in question it was the object of petitioners to obviate the expense of two telephones, where one could be made to answer the purpose of both, and to bring about the same facilities of communication among telephone subscribers in the city, and between them and the towns of the second and third group, that they now have with the numerous towns of the first, or Swaverly, group, and with the towns and cities in the southeastern part of the State.

Upon the hearing of the case in the circuit court the order of the commission was upheld and a decree entered dismissing complainant's bill. From this decree complainant, the Michigan State Telephone Company, appeals to this court.

The power of the railroad commission to regulate the business of telephone companies is to be found in Act No. 206 of the Public Acts of 1913 (2 Comp. Laws 1915, §§ 6689-6714), and authority to require the physical connection of telephone lines is contained in section 6 of the act, which reads as follows:

"Whenever the commission, after a hearing had on its own motion or upon complaint of any party in interest, shall find that a physical connection can reasonably be made between the lines of two or more persons, copartnerships or corporations operating telephone lines, whose lines by such connection can be made to form a continuous line of communication, and that public convenience and necessity will be subserved thereby, or shall upon like motion or complaint find that two or more persons, copartnerships or corporations so operating telephone lines have failed to establish joint rates, tolls or charges for service by or over their said lines, the commission may by its order require that such physical connection be made, and may prescribe through lines and joint rates, tolls and charges to be made and to be used and observed in the future. If such persons, copartnerships or corporations so operating telephone lines and telephone facilities do not agree upon the division between them of the cost of installing of such physical connection or connections, or the division of any joint rate, tolls or charges established by the commission over such through line, the commission shall have authority after hearing to establish such division."

Upon considering this section of the act, it will be observed in the first place, that the railroad commission is given no authority by the statute to require a physical connection between the lines of two or more persons, copartnerships, or corporations operating telephone lines, unless the lines, by such connection, "can be made to form a continuous line of communication." Complainant insists that this means a "continuous line of communication" between places not already connected by any telephone line, and that it does not apply to such a situation as that at Traverse City, which is now connected with practically all other places by the lines of the Michigan Company. If the lines of the Michigan Company, counsel say, in illustrating their position, ran only from Charlevoix to Traverse City, and the lines of the Citizens' Company ran only from Traverse City to Cadillac, then the lines might be re-

quired to connect so as to form a continuous line of
communication between Charlevoix and Cadillac. And
counsel argue that the statute should be so construed
as to authorize the requirement of physical connection
between telephone lines only in situations substantially
covered by the illustration. In other words, it is coun-
sel's position that in the hypothetical case connection
of the lines might be required, under the statute, so
that subscribers of the Citizens' Company in Cadillac
could talk with subscribers of the Michigan Company
in Charlevoix, but that it could not be required so that
subscribers of the Citizens' Company in Traverse City
should have the same privilege. In this we think coun-
sel for complainant attempt to read into the statute a
limitation not expressed by its language. There is
nothing said about existing lines of communication, or
the absence of such lines. Nor is the continuous line
spoken of restricted to communication between differ-
ent towns and cities. We think the statute must be
held to give the commission authority, if other neces-
sary conditions exist, to order a physical connection
of telephone lines whenever and wherever those lines
"by such connection can be made to form a continuous
line of communication," whether the communication
is between different towns or between subscribers to
different telephones in the same town.

Complainant also claims that an enforced physical
connection between its lines and those of the Citizens'
Company would not be an exercise of the right of regu-
lation, but would amount to such a taking of its prop-
erty as could be justified only under the power of emi-
nent domain and upon the payment of compensation.
As the basis of this contention, it is argued that the
Citizens' Company would be given the use and control
of complainant's lines every time one of its subscribers
talked over them by means of the connection. In sup-
port of this position our attention is directed to *Pacific*

*Telephone & Telegraph Co.* v. *Eshleman,* 166 Cal. 640 (137 Pac. 1119, 50 L. R. A. [N. S.] 652, Am. & Eng. Ann. Cas. 1915C, 822). With all due respect for that court, however, we find ourselves unable to agree with its conclusion as to the effect of a connection between competing lines. The business of a telephone company is to transmit oral messages from one point to another, and for that purpose every patron, whether he is a subscriber or not, has the use of its lines for the time being. That is the public use to which they are dedicated. Without the physical connection each subscriber to a Citizens' telephone is entitled to the same use of complainant's lines that he would have with the physical connection; the difference being that with the lines connected he can talk from his own telephone, while without the connection he would be obliged to go to a public station of complainant company. The relations of a telephone company in this State are not simply with its own subscribers, but with the public generally, and it is forbidden by law to make any discrimination between persons. 3 How. Stat. (2d Ed.), § 7221, 2 Comp. Laws 1915, § 6688. Complainant would have the same control over its own lines if the Citizens' subscriber should talk from his house or office that it would have if he should talk from one of complainant's public stations; and complainant, not the Citizens' Company, would receive compensation for the use of the lines. It would amount simply, so far as this phase of the matter is concerned, to a difference in the way messages were got to and from the Citizens' subscribers, and would be, not a taking of property by eminent domain, but a regulation in the interest of the public. This conclusion, we think, is in accordance with the weight of authority. *Pacific Telephone & Telegraph Co.* v. *Wright-Dickinson Hotel Co.,* 214 Fed. 666; *Pioneer Telephone & Telegraph Co.* v. *State,* 38 Okl. 554 (134 Pac. 398); *Wis-*

*consin Telephone Co.* v. *Railroad Commission,* 162 Wis. 383 (156 N. W. 614, L. R. A. 1916E, 748).

In one sense there may be, and often is, a taking of property through the legitimate exercise of the power of regulation, and as necessarily incident thereto. In such case the company whose business is subjected to the regulation is not deprived of the title to or possession of its property, but it may be required to forego profits which it might otherwise receive; to apply its property, within the dedicated use, to some purpose contrary to its wishes; to expend its money as it would not otherwise expend it; to perform service it would not perform except for the regulation; and to submit to losses which it would prefer to avoid. In *Wisconsin, etc., R. Co.* v. *Jacobson,* 179 U. S. 287 (21 Sup. Ct. 115), the railroad company was required to expend its money for a railroad connection, and to submit to certain losses in revenue. In *Chicago, etc., R. Co.* v. *Iowa,* 233 U. S. 334 (34 Sup. Ct. 592), the company was required to accept and transport loaded cars received from other railroads, although it was willing and desired to use its own cars for the purpose. In *Mayor, etc., of Worcester* v. *Railroad Co.,* 109 Mass. 103, the company was subjected to heavy expenses in establishing a union depot. And see *Oregon R. R. & N. Co.* v. *Fairchild,* 224 U. S. 510 (32 Sup. Ct. 535); *Pittsburg, etc., R. Co.* v. *Railroad Commission,* 171 Ind. 189 (86 N. E. 328); *Grand Trunk R. Co.* v. *Railroad Commission,* 231 U. S. 457 (34 Sup. Ct. 152), and many other cases. These relate mainly, if not wholly, to the connection of railroad tracks, but the principles announced are applicable to the control of any public utility by the State.

Inasmuch as the regulation of public utilities by the State is thus, and necessarily, an interference to some extent with private property, it can be justified only by the demands of public convenience and necessity;

and the regulation must be reasonable, having in view the public interest to be subserved and the extent of the burden imposed. *Oregon R. R. & N. Co.* v. *Fairchild, supra; Great Northern R. Co.* v. *Minnesota,* 238 U. S. 340 (35 Sup. Ct. 753).

The commission has found that the physical connection of telephone lines as directed by the order in question is a public convenience and necessity, and we think it had sufficient grounds for that conclusion. The telephone has become a vital element in the business and social life of the people, and enters so largely into the conduct of all of their affairs that the elimination of unnecessary expense and the saving of time in its use have become matters of importance. Men can no longer afford to loiter around public pay stations for the purpose of sending or receiving messages, and the duplication of instruments in the house and office has grown into a waste of large proportions. These evils come largely from the existence of competing companies in the same community, and so far as reasonable regulation can improve the situation such regulation is assuredly required by public convenience and necessity. Communities should not be held up until one or the other of adverse companies has been eliminated through the long battle of competition, if the delay can be justly and lawfully avoided. This was evidently the view of the legislature when telephone companies were brought under the control of the railroad commission, and that body was given the powers of regulation conferred by the statute referred to. It is suggested, however, by counsel for complainant, that the evils mentioned as furnishing grounds for regulation in the interest of the public are evils common to all competition between telephone companies, and could not have been within the contemplation of the legislature when it required in each case, before action by the commission, a special

finding that public convenience and necessity would be subserved thereby. In answer it may be remarked that the existence of a public necessity in each particular case would not be diminished by the existence of the same public necessity in all cases. And the results of competition must vary as between different localities, so that the question remains in every instance whether public convenience and necessity requires action on the part of the State in that particular case. It is also suggested by complainant that the connection of lines at Traverse City is not necessary because the residents of that city can rid themselves of the troubles of which they complain by surrendering their Citizens' telephones and substituting those of the complainant company. This is the solution that competition always holds out to the public. But experience has shown that it is not a very practical solution, and it ignores the necessities of the outside public which requires facility of communication with Traverse City as much as Traverse City requires facility of communication with the outside public. And this public necessity spoken of in the statute is not an absolute necessity. We agree with the supreme court of Wisconsin that:

"If there was a strong or urgent need of the connection here sought, then there was a necessity for it." *Wisconsin Telephone Co.* v. *Railroad Commission, supra.*

And there was evidence justifying the commission in finding the existence of such need.

That a physical connection may be required, in many instances at least, between the lines of competing companies without injury to either, is clearly shown by the record in this case. The toll lines of the Citizens' Company and those of the Michigan Company both run into the same exchanges in the 30 cities and villages of the Swaverly territory, as well as into the

exchanges of the more numerous places in the south-eastern part of the State.    While this arrangement may not constitute a technical connection of the lines, it yet has the effect as to toll service of a physical connection.    Neither party complains of injury from this mutual service, while the results are unquestionably beneficial to the public.    And complainant may well be required by the commission to extend the same facilities generally to the residents of Traverse City unless it has been able to show some insuperable objection to doing so.

The objection complainant does raise as to the reasonableness of the order in question relates entirely to its effect upon its local exchange in Traverse City. That exchange, it says, will be destroyed if the order goes into effect.    It bases this conclusion upon the fact that the business houses of the city find it necessary, without the connection, to use its telephone in communicating with the towns in the third group, as we have classified them, to which complainant has the only toll line.    These telephones will be no longer required, it says, if, by means of the connection, these towns can be reached from the telephones of the Citizens' Company.    And it further claims that with the removal of its telephones in the city the value of its toll service with the Swaverly towns must be much impaired.

Undoubtedly complainant might suffer some loss if these results should in fact follow the enforcement of the order; yet just what the loss might amount to we are unable to determine with any accuracy from the record.    But we do not think that complainant has shown with sufficient certainty that the apprehended results would in fact follow the enforcement of the order.    And it is insisted by the railroad commission that they would not.    The commission has full power under the statute to prescribe the joint rates, tolls,

and charges to be made for the use of the connection and to determine the division of such rates, tolls, and charges if the parties interested fail to agree upon the division. In fixing these rates, tolls, and charges the commission seems to have a very large discretion, and while unquestionably they must be reasonable when all the circumstances affecting the situation are taken into consideration, yet they are not necessarily limited to the actual cost of operation or even to an ordinary profit thereon. In fixing the rates, tolls, and charges, the commission may undoubtedly take into consideration all of the equities growing out of the regulation and make use of the rates in adjusting those equities. This the commission says it intends to do, and it has retained jurisdiction of the matter for the purpose of fixing and adjusting the rates, tolls, and charges if the parties themselves fail to agree upon them. And the commission insists that a proper adjustment of rates, tolls, and charges will prevent the injurious results anticipated by complainant. It is the purpose of the commission, it says, not to make use of the rates, tolls, and charges by way of compensation, but to prevent the occurrence of loss. In other words, a proper adjustment of the rates, tolls, and charges will, in the judgment of the commission, remove all inducement on the part of complainant's subscribers in Traverse City to discard the telephones they now hold from complainant, and thereby to injure its local exchange.

Will the adjustment of the rates, tolls, and charges, when properly made, remove the danger of destruction of its local exchange which complainant fears? The whole thing, both as to the danger of loss and as to the remedial provisions intended by the commission, is somewhat a matter of speculation. It is for complainant to show affirmatively that the physical connection ordered by the commission will inflict upon it

an undue loss and one that cannot be prevented by the contemplated adjustment of rates, tolls, and charges. The interest of the public in a proper regulation of public service corporations is continually becoming more vital and important, and any action of the State through its organized boards and commissions in the exercise of that power should not be set aside by the courts, except in instances of the clearest necessity. This is the view taken by the legislature. Section 18 (2 Comp. Laws 1915, § 6706) of the act explicitly declares that:

"In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."

What rates would be required to prevent the surrender of complainant's telephones by such residents and business houses of the city as now employ them is not shown by the record. Nor is it shown that an adjustment of rates, tolls, and charges by the commission under its powers as we have construed them could not be so made as to obviate the injurious results which complainant apprehends from an enforcement of the order. And from the very nature of the order it is within the power of the commission to rescind it if it is found to operate unduly to complainant's injury.

For these reasons, the decree appealed from will be affirmed, with costs to the defendant.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.