CITY OF TRAVERSE CITY *v.* CITIZENS' TELEPHONE CO.

1. TELEGRAPHS AND TELEPHONES—FRANCHISE—PROPERTY—POWER TO SELL.

   A telephone company may sell its property, franchise and privileges to any other duly organized telephone company.

2. SAME—FRANCHISE, SUCCESSOR BOUND BY—CONTRACTUAL RELATIONS.

   Where a telephone franchise runs to the company, its successors and assigns, and the assignee of the franchise is recognized, the contention that it is a stranger to the franchise because it is not in express language nominated in the instrument of transfer, is not tenable.[1]

3. SAME—MUNICIPAL CORPORATIONS—USE OF STREETS.

   The right of a telephone company under its primary franchise from the State to use highways within the State for extension of its lines does not release it from contractual obligations arising from a secondary franchise granted by the municipality in which it is operated and to which it succeeds by assignment.

4. SAME.

   The right conferred by general law upon telephone companies to use highways of the State as avenues of communication for their methods of transmitting messages and to establish their lines along them for that purpose does not confer the unrestricted right to invade cities and villages and erect their poles or string their wires where and as they may find it most economical or convenient.

5. SAME—FREE PHONES FOR USE OF CITY—CONSIDERATION.

   A provision in a franchise granted a telephone company by a city for the use by the city of telephones furnished by the company free of charge is valid and is based upon sufficient consideration.

6. SAME—RATES—REGULATION BY FRANCHISE.

   Although a franchise granted a telephone company by a city regulating charges is permissive only, it remains valid

[1]On right to transfer or mortgage privilege of using streets for telegraph or telephone, or other quasi-public purpose, see note in 47 L. R. A. 87.

between the parties where no application has been made to the proper governmental authority for relief.[1]

7. SAME—RATES—PENALTY FOR DELINQUENTS.

Where a telephone franchise ordinance provides that all rates shall be paid quarterly in advance and makes no other provision as to time and terms of payment and is silent as to delinquencies and penalties, it is not a violation of the ordinance to make a reasonable additional charge in case the rates are not paid before a later specified date.[2]

8. SAME—REASONABLE PENALTY—QUESTION FOR RAILROAD COMMISSION.

Whether a rate charged by a telephone company is reasonable and warranted in any particular case is primarily a question of regulation for the railroad commission under its power of general supervisory control over telephone companies within the State.

9. SAME—FRANCHISE—RATES—PUBLIC INTEREST.

Where a franchise ordinance regulating the charges and service to be furnished by a telephone company does not describe any particular kind of telephone system or service which should be installed or furnished, such ordinance should be given the permissible interpretation which best conserves the public interest.

10. SAME—INCREASED RATE—APPLICATION TO RAILROAD COMMISSION.

Under Act No. 206, Pub. Acts 1913, § 10 (2 Comp Laws 1915, § 6698), forbidding under a penalty the increasing of telephone charges by telephone companies under any circumstances whatever, except upon application to the railroad commission and a finding by such commission that an increase is justified, the filing of a purported schedule of rates by a telephone company does not operate to release it from its contractual obligations with a city as to charges where the commission is not shown to have been advised of an increase of rates.

---

[1]The question of power of legislature to fix tolls, rates or prices particularly as to telephones and telegraphs, is discussed in a note in 33 L. R. A. 181.

[2]On right of public service corporation to exact charge in addition to maximum rental fixed by public for delay in rental, see note in 31 L. R. A. (N. S.) 329; 43 L. R. A. (N. S.) 63.

11. SAME—RATES—REGULATION BY RAILROAD COMMISSION—EQUITY
    —INJUNCTION.

  In view of the statute committing to the railroad com-
    mission governmental supervision, control and regulation
    of telephone companies doing business in the State and
    providing for review of its action by appeal to the courts,
    equity courts will only assume jurisdiction in the first
    instance to exercise authority in exceptional cases for
    special purposes, and will enforce an existing contract
    obligation, which, under existing conditions, the offending
    party may not repudiate.

Appeal from Grand Traverse; Mayne, J.   Submit-
ted October 4, 1916.  (Docket No. 35.)  Decided March
30, 1917.

Bill by the city of Traverse City against the Citi-
zens' Telephone Company for an injunction restrain-
ing defendant from charging excessive rates.   From
a decree for plaintiff, defendant appeals.   Modified
and affirmed.

*Travis, Merrick & Warner* (*John W. Patchin*, of
counsel), for appellant.

*George H. Cross*, City Attorney, for appellee.

STEERE, J.   Plaintiff was incorporated as a city in
1895 by local act (Act No. 424) granting it a special
charter, which, in relation to its streets, gave its coun-
cil power to "regulate the use of the public highways,
streets, avenues and alleys of the city, subject to the
right of travel therein,   *   *   *   and to regulate,
prohibit or license the use of telegraph, telephone,
electric light and power poles or wires, over or under
the streets."

 In 1898 the Northern Telephone Company was in-
corporated under the general telephone law and made
application to the common council of Traverse City
for a franchise to use its streets for poles, wires, etc.,
and to carry on a regular telephone business within

the city, which was granted by an ordinance dated September 19, 1898, with a provision that it should be null and void, unless accepted within 30 days. On October 5, 1898, the Northern Telephone Company accepted the same in writing, and at once commenced the construction of its telephone system, which was put in operation with all convenient speed, and thereafter operated by said company in harmony with the provisions of said ordinance until about August 1, 1900, when it sold its assets and business to defendant, the Citizens' Telephone Company, and thereafter ceased to figure in the transactions involved here.

The franchise of September 19, 1898, which had been given to the Northern Telephone Company, "its successors and assigns," and complied with by it while owning and operating the system, granted it (with specifications not material here) the right to use the streets, avenues, and alleys of the city for the construction and operation of a telephone system, and to place conduits in any of the streets, alleys, etc., if desired in lieu of pole lines; required it to furnish to the city free of charge seven telephones and for the school buildings in the city not to exceed six telephones on certain stated terms, and further provided:

"SEC. 4. Said grantee, its successors and assigns, may charge the following rates for the use of its telephones within the city limits when the subscribers shall enter into a written contract for the use of a telephone for a business place for a term of five years, twenty-four dollars ($24.00) per annum. When the subscriber shall enter into a written contract for the use of a telephone for a place used exclusively for a dwelling, for a term of five years, twelve dollars ($12.00) per annum. For a term less than five years an additional charge of two dollars ($2.00) per year to these rates may be made. All rates to be paid quarterly in advance. Said grantee shall not, however, be required to put in a telephone for less than the rental of one-quarter of a year."

Defendant was incorporated under the general State telephone law in September, 1898, with its main offices at Grand Rapids, Mich., and on July 24, 1900, bought out the Northern Telephone Company, taking over its property and business, including its exchange, toll lines, and contracts with subscribers. By the terms of their written contract of that date, providing for transfer of possession on August 1st, the Northern Company sold to defendant for a stated consideration its "telephone property in Traverse City," and agreed to—

"execute or cause to be executed proper bills of sale satisfactory to first party, covering all said property, being the Independent Telephone Exchanges at Traverse City, Suttons Bay, together with farmers' and toll lines connecting therewith from Acme west to Traverse City as mentioned above, and also lines in the county of Leelanau, together with all exchanges and toll line material and apparatus on hand, including poles, cross-arms, batteries," etc.

On September 11, 1900, it executed to defendant a bill of sale of—

"all telephone toll lines, exchanges, telephone poles, wire and apparatus used or to be used in connection therewith, including all telephone property in the counties of Leelanau and Grand Traverse in said State of Michigan, belonging to the Northern Telephone Company, and now in its possession or the possession of said Citizens' Telephone Company in said counties."

On taking possession of the property and assuming management of the system defendant continued the business as previously conducted, furnishing free telephones to the city and service to its patrons at the same rates as before in harmony with the provisions of the existing franchise. As the business developed it extended its lines to new subscribers and exercised the right to place conduits in the streets and alleys. Changes and improvements were made in its system

from time to time as manner of service changed and advanced in that means of communication. Its affairs were apparently conducted in a manner satisfactory to the city authorities and without shown complaints until about the time this bill was filed. Just when that was is not stated in the record as required by rule, but it is shown that "on reading and filing the bill of complaint in this cause," a preliminary injunctive order, without date, was granted to plaintiff restraining defendant from collecting more than $12 per year rental for residence phones, and $24 per year for office or business phones, payable quarterly in advance, prohibiting it from enforcing a money penalty of 50 cents per quarter on residence and 75 cents on business phones for delinquency in payments when due, from disconnecting or removing phones for not paying the excess charges referred to, and from installing or leasing any "party line phone" until further order of the court. The bill of complaint was sworn to by the mayor of Traverse City on January 22, 1914. A lengthy answer without date or time of filing appears in the record and a replication dated April 13, 1914. An undated motion to set aside the restraining order, accompanied by an affidavit sworn to on March 18, 1914, was evidently presented and argued on or before July 30, 1914, at which time the court rendered a written opinion expressing the view that concurrent, if not exclusive, jurisdiction over the issues involved is given the Michigan railroad commission by Act No. 138, Pub. Acts 1911, and so far as possible all parties should be left to their statutory remedy there provided; for which reason the injunction was "dissolved as to all new business," but retained in force "so far as is necessary to protect the parties now holding contracts with said company," continuing in effect rates provided by the ordinance, and prohibiting collection or enforcement of penalties

for deferred payments until further order of the court.

The case was heard on pleadings and proofs taken in open court, beginning March 18, 1915, and on February 4, 1916, a decree was rendered in plaintiff's favor granting the injunctive relief asked, with a concluding provision that nothing contained in the decree should be construed as preventing either party from applying to, or taking, other proper pleadings under the laws of the State before the Michigan railroad commission.

Without detailing the lengthy proceedings of the respective parties, it may be stated in brief that the scheme and purpose of plaintiff's bill is to enjoin defendant from exacting rates in excess of those nominated in the franchise or enforcing a penalty against delinquent subscribers, and to compel it to furnish at the ordinance rates "individual lines," as distinguished from "party lines," to citizens desiring them. The essence of defendant's answer is that it only bought the physical assets of its predecessor, is not a party to or bound by the franchise, but under the general laws of the State had and has the right to use the streets and alleys of the city under reasonable regulations promulgated by the common council as to the manner of such use, denies that its rates or methods of service are in fact in violation of the ordinance, points out that its alleged excess charges are only for extra, or special, service or appliances, claims the penalty imposed for default in payment is but a reasonable requirement, permissible and essential to enforce prompt payment, and that the whole matter of rates and method of conducting its telephone business is for the State railroad commission, to which general control of all telephone lines within the State has been relegated by the legislature under Act No. 138, Pub. Acts 1911, and Act No. 206, Pub. Acts 1913 (2 Comp. Laws 1915, § 6689 *et seq.*).

While Act No. 138 is repealed by Act No. 206, a comparison of the two laws discloses that the latter serves, in effect, to re-enact and strengthen the former, much of it being verbatim, with added provisions enlarging the scope of the law and authority of the railroad commission. Section 19 of the act of 1911 required, as does section 21 of the law of 1913, that every company operating a telephone line within the State should file with the railroad commission a schedule of its rates, charges, and tolls, which must also be kept on file and accessible to the public in its principal place of business and at its exchange or toll station. On February 7, 1913, defendant filed with the railroad commission the following schedule of its rates in Traverse City:

|  | Yearly Rate. |
|---|---|
| "Business: | |
| Individual line—less than 5-year contract | $26 00 |
| Individual line—5-year contract | 24 00 |
| Party line—selective | 20 00 |
| Extension telephone | 8 00 |
| Directory insertion—extra user combined | 14 00 |
| "Residence: | |
| Party line—wall—less than 5-year contract | 14 00 |
| Party line—wall—5-year contract | 12 00 |
| Desk set in residence in place of wall telephone | |
| — extra | 4 00 |
| "(Installed only on individual line). | |
| Extension telephone—wall | 6 00 |
| Extension telephone—desk | 8 00 |
| "(Desk extension installed only on individual line.)" | |

To this is added penalty charges for default in payment on or before the 25th day of the first month of the quarter, ranging from 25 to 75 cents, and a statement of charges on rural lines not material here. This schedule was not, as a matter of fact, the rates uniformly charged to all subscribers for like service. The same rates to all patrons which were in force when

defendant took over the system were continued by it
for some four or five years, during which time various
improvements were installed, including a change from
the common return to metallic circuits, after which
new subscribers were charged $14 and $26, respect-
ively, for residence and business phones, while old
subscribers were continued at the former rates.   The
penalties for delinquency had been in force for several
years prior to 1913.   About January 1, 1914, defend-
ant sent notice to its subscribers that its standard
rates for residence phones upon party lines was $14
per year, with the explanation that:

"For the purpose of eliminating discriminations
that now exist in connection with our residence ser-
vice it will be neccessary for us to give you this kind
of service, and charge you the regular rate for same,
starting January 1, 1914."

The fact that in its effort to escape the result of
admitted discrimination in rates defendant was moved
to choose that horn of the dilemma which revised
its tariff upwards appears to have been the awakening
grievance which actuated plaintiff to file this bill, and
its standing in court as to the matters of which it
complains must necessarily be based on contractual
obligations arising out of the franchise granted to the
Northern Company and assumed by defendant under
its purchase of the Traverse City telephone system
from the former.   This franchise ran to the Northern
Telephone Company, "its successors and assigns."   Of
its right to sell its property, franchise, and privileges
to any other telephone company organized under like
laws, there can be no question.   *Michigan Telephone
Co.* v. *City of St. Joseph,* 121 Mich. 502 (80 N. W.
383, 47 L. R. A. 87, 80 Am. St. Rep. 520) ; *Home
Telephone Co.* v. *Railroad Commission,* 174 Mich. 219
(140 N. W. 496).   Defendant is the successor and
assign of the Northern Telephone Company and the

contention that it is a stranger to the franchise because it was not in express language nominated in the instrument of transfer from the Northern Company is not tenable under the undisputed acts of recognition and other facts shown. *Mahan* v. *Telephone Co.*, 132 Mich. 242 (93 N. W. 629) ; *City of Wichita* v. *Trust Co.*, 132 Fed. 641. Defendant's right under its primary franchise from the State to use highways within the State for extension of its lines does not relieve it from contractual obligations arising from a secondary franchise granted by the municipality in which it is operated. Its obligations under that franchise are the same as were its grantors. What those obligations are is the more important question.

Defendant's contention that the franchise, though applied for and accepted by the grantee, did not constitute a binding contract because it conferred no benefits, or additional rights in the use of plaintiff's streets beyond that given by the State law, and was therefore without consideration, is not well founded. The right conferred by the general law upon telephone companies to use highways of the State as avenues of communication for their methods of transmitting messages and to establish their lines along them for that purpose does not confer the unrestricted right to invade cities and villages and erect their poles or string their wires where and as they may find it most economical or convenient. *Michigan Telephone Co.* v. *City of Benton Harbor*, 121 Mich. 512 (80 N. W. 386, 47 L. R. A. 104) ; *Village of Jonesville* v. *Telephone Co.*, 155 Mich. 86 (118 N. W. 736, 130 Am. St. Rep. 562, 16 Am. & Eng. Ann. Cas. 439). While the municipalities may not annul the general statute by arbitrarily refusing to permit the use of their streets to telephone companies, they may have under their charters, as in the instant case, controlling authority within reasonable limits, in the exercise of their police

power, to direct upon which streets and in what manner the lines shall be installed, and may prohibit entirely the erection of poles on streets and in places which will injure or incommode the public. In *Jonesville* v. *Telephone Co., supra,* it is said:

"The mere fact that the route designated by the municipality is less convenient or involves on the part of the telephone company a larger expenditure is of no consequence so long as the company is not thereby prevented from reaching all those it desires to serve or who desire service from it."

At the inception of its enterprise it was manifestly to the interest of the Northern Telephone Company to secure from the city an agreement defining how and where it might install its lines along the streets, both as to restrictions which would be imposed upon it and privileges granted in that particular. Its petition to that effect was favorably acted upon, and a 30-year franchise granted directly to it embodying satisfactory terms, which it accepted in writing. Definite authority was given without restriction of routes to either use the highways of the city for its pole lines, or, at its option, to place conduits in any of the streets, lanes, or alleys of the city in lieu of pole lines.

The agreement touching telephones free of charge for city use also involved recognized elements of a valid contract based upon a consideration to both parties. Of such an agreement it was said in *City of Superior* v. *Telephone Co.,* 141 Wis. 363 (122 N. W. 1023):

"It is obvious that it was important for the telephone company to be able to afford its general customers facilities for communicating by telephone with the public offices. That opportunity could not operate otherwise than to render the service it offered in general more valuable than it would otherwise be and so attract customers and greatly extend its sphere of operations. That which it sought to obtain was then a legitimate basis for a contract."

While plaintiff was not given by its charter express power to regulate rates, it had under its charter implied administrative authority to make permissive contracts as to them. A franchise of this nature, involving beneficial considerations to both municipality and the grantee, then accepted and operated under, becomes a binding contract, which neither party to it can disregard. 28 Cyc. p. 880.

Under the situation presented here, where no paramount governmental authority has acted or been appealed to, the argued question of whether this contract as to rates is permissive only and subordinate to reserved legislative authority to control and regulate rates or is inviolable under constitutional limitations is unimportant. Accepting it as permissive only, it remains valid between the parties until such time as the reserved State control is asserted and interposed against it. The statute conferring controlling powers upon the railroad commission does not of itself abrogate the contract. *City of Manitowoc* v. *Traction Co.,* 145 Wis. 13 (129 N. W. 925, 140 Am. St. Rep. 1056) ; *Charleston Consolidated Railway, etc., Co.* v. *City Council,* 92 S. C. 127 (75 S. E. 390). Here the State authority has not been exercised or appealed to. Neither party has made application to the railroad commission for relief.

Plaintiff is not entitled to injunctive relief against the penalty charges complained of. The ordinance provides for "all rates to be paid quarterly in advance." It makes no other provision as to time and terms of payment, and is silent as to delinquencies and penalties. In such case it is not a violation of the ordinance, where rentals are payable in advance, to make a reasonable additional charge in case they are not paid before a later specified date. *State, ex rel. MacMahon,* v. *Telephone Co.,* 59 Wash. 156 (109 Pac. 366, 31 L. R. A. [N. S.] 329). Whether

such charge is reasonable and warranted in any particular case is primarily a question of regulation for the railroad commission under its power of general supervisory control over telephone companies within the State. Neither in this case is it shown that there are or will be any delinquents who might be wronged by the extra charge or that any primary injury has been suffered by any one. No case demanding equity cognizance and injunctive relief is made out in that particular. *City of Owosso* v. *Telephone Co.*, 185 Mich. 349 (151 N. W. 1029).

Against plaintiff's contention that citizens desiring telephones are entitled to individual line service at the ordinance rates, because a standard service in common use, and defendant is under contractual obligations to furnish the same when requested, it is urged that the ordinance did not specify the kind of service to be furnished, and at the time of its adoption the service in vogue was the now obsolete common return system by which many subscribers were placed on the same return wire, each subject to interference from others on the same return, and the selective party line service now in use is an improvement over and much superior to that system; that the cost of individual line service with two copper wires running from the central exchange to each subscriber is prohibitive, and that quality of service, not used or known when the alleged contract was made, cannot be furnished at the rate specified without loss in the business and ultimate bankruptcy; and the schedule of rates filed by defendant with the railroad commission in compliance with statutory requirements fixes the only rates that may be lawfully charged, unless and until changed by the commission.

It is true that in its descriptive features the ordiance did not, for the protection of either party, prescribe any particular kind of telephone system or ser-

vice which should be installed or furnished. It did recognize and prescribe a different rate for "the use of a telephone for a business place" and for "a place used exclusively for a dwelling," and between a five-year contract and a shorter period. The accepted ordinance ran for 30 years. The contract was then entirely executory, and presumptively the contracting parties contemplated the installation and maintenance of a system during that period reasonably adequate to furnish citizens of Traverse City, at the specified rates, efficient telephone service of the nature and quality generally in vogue while the contract was in force.

It is common knowledge, and was shown in this case, that since adoption of the ordinance many radical and beneficial improvements have been made by which telephone service has been rendered more practical, satisfactory, and efficient. Defendant showed that it had kept its system and service up with the progress of improvements as they developed and were generally adopted. It is said by its counsel, and is unquestioned, that no court would think of ordering a return to the old, long since discarded common return wire service generally in use when the ordinance was adopted, which itself was a radical improvement over the then obsolete ground return service which preceded it. To overcome defects in its system and increase demands for telephones by keeping up with the growing efficiency of the service was clearly a business necessity and to the advantage of defendant, as well as a benefit to patrons whom it was required to serve impartially in its capacity as a public corporation. It may reasonably be assumed that this course was in contemplation of the contracting parties. Though questioned by plaintiff, it was fairly shown by defendant's evidence that its present selective party line service is superior to the old common return service; but in construing the contract that cannot be taken as the

test. It is the settled rule of construction that when a public utility contract of this nature contains scant words or provisions capable of varied meaning in the connection used, they should be given the permissible interpretation which best conserves the public interest.

The question of what kind of telephone service could be demanded under an ordinance in that respect as meager in details as this arose in the case of *Chas. Simons' Sons & Co.* v. *Telephone &· Telegraph Co.,* 99 Md. 141 (57 Atl. 193, 63 L. R. A. 727). The court there said:

"Now, the ordinance here which constitutes the contract between the city of Baltimore and the appellee, in its fourth section, where provision is made for furnishing to the citizens telephone service at the rate of $48 for business places and $36 per annum for dwellings, uses the word 'telephone' generally, and does not specify any particular description of service to be furnished. The most natural and reasonable construction to be given, or meaning to be imputed, to the word 'telephone' as here used is the telephone with all improvements, equipments, and appliances essential in its operation to make it most effective in use."

Of an Indiana statute, enacted in 1885, prohibiting individuals and companies operating telephone lines in that State from charging "as rental for the use of such telephones a sum exceeding $3 per month," it is said to have been the evident intention of the legislature—

"that where a telephone company was doing a general telephone business in this State, any person within the local limits of its business in a town or city should have the right to demand and receive a telephone and telephonic connections, facilities and service, the best in use by such company, and should only be liable to be charged and to pay $3 per month therefor." (*Central Union Telephone Co.* v. *State,* 118 Ind. 194, 208).

In *Chicago Telephone Co.* v. *Manufacturers' Ass'n,* 106 Ill. App. 54, involving an ordinance, granted in

1889, when the grounded line service was in vogue, providing that the grantee "shall not increase to its present or future subscribers the rates for telephone service now established," the question arose as to whether the language used prevented the telephone company from "increasing its rates for telephone service generally during the term of the ordinance, or increasing its rates for that kind of telephone service which it furnished at the time of the acceptance of the ordinance." Of this the court said in part:

"The ordinance does not undertake to describe what the telephone service to be furnished by the defendant should be nor what appliances or apparatus should be furnished therefor. * * * We think that the reasonable construction of the language in question is, that it was intended thereby that the defendant should not, during the term of the ordinance, increase its rates, which it was, when the ordinance was passed, charging for telephone service. And by telephone service there was intended not only the particular service then being rendered, but as well any improvement of the telephone service which the company might thereafter adopt and put in use, whatever might be the appliances and instruments used to improve and make it more efficient and satisfactory than the service in use January 10, 1889. If, as is contended by the learned counsel for appellant, the rates fixed by the ordinance were intended to apply only to the telephone service then established, and in use when the ordinance was passed, it would follow that any improvement in the art which made necessary the addition of another wire, or any different instrument or appliance to use such improvement, if the company adopted and used such improvement, would allow the company, when it furnished a patron such instrument or appliance, to charge a rate without limitation. Such a construction, as it seems to us, would be unreasonable, and could not have been intended by the language used."

That in February, 1913, defendant filed a purported schedule of its rates in ostensible compliance with the

requirements of the act of 1911, did not operate to release it from these contractual obligations. The act which had long been in effect when the schedule was filed required it to file, not a proposed schedule, but a "schedule of rates, charges, and tolls made, charged, and collected." At that time, for years before and continuing thereafter until this bill was filed, old subscribers were charged one price and new subscribers another for the same kind of service. The circumstance that its charges were discriminatory, and in avoidance of such illegality it filed a schedule increasing in part the rates it was actually charging, of which the commission is not shown to have been advised and upon which it took no action, did not serve to relieve the situation or establish legal rates. It was an attempt to increase some of its rates, or charges, without authority from the commission. Section 10 of the act of 1913 forbids it, under a penalty for so doing, from increasing *any* of its charges "under *any* circumstances whatever, except upon application to the commission, and a finding by such commission that such increase is justified."

The fundamental, affirmative, and negative principle of general application under which equity is impelled to take jurisdiction in any of this class of controversies is thus stated in 5 Pomeroy's Equity Jurisprudence, § 263:

"Wherever a right exists or is created, by a contract, by the ownership of property or otherwise, cognizable by law, a violation of that right will be prohibited, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy."

This record presents a case where, in the absence of any appeal to or any action taken by the railroad commission, complaint is made of and injunctive relief asked against defendant for violation of its contract obligations. As this case now stands we are impelled

to conclude that such obligations, with continuing violation of them, are disclosed, under circumstances which bring the contention within the rule established in *City of Monroe* v. *Railway,* 187 Mich. 364 (153 N. W. 669), where it was strenuously contended by defendant that relator could only resort to the railroad commission for relief, and this court said:

"On the contrary, it seems wholly reasonable that it [defendant] should perform its contract obligations until relieved therefrom by competent authority."

In view of the statute committing to the railroad commission governmental supervision, control, and regulation of telephone companies doing business in the State, and providing for review of its action by appeal to the courts, equity courts will only assume jurisdiction in the first instance to exercise such authority in exceptional cases for special purposes, and, while various other matters are mooted in the record, this opinion is directed and limited to the one question of enforcing existing contract obligations which under existing conditions the offending party may not repudiate.

The learned circuit judge rightfully took pains to make plain in his decree that it went no further than as above indicated, and provided that it should not be construed as prohibiting either party from making application to or taking such other proceedings before the railroad commission as was proper, and it might be advised.

As herein indicated, the decree will be modified to eliminate restraint from imposing and collecting penalty charges for delinquency in payment, and otherwise stand affirmed, with costs to plaintiff.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.