CITY OF TRAVERSE CITY *v.* MICHIGAN RAILROAD COM-
MISSION.

1. TELEGRAPHS AND TELEPHONES—COMMON CARRIERS—REGULATION
—MICHIGAN RAILROAD COMMISSION.

Under Act No. 206, Pub. Acts 1913 (2 Comp. Laws 1915,
§ 6689 *et seq.*), the status of telephone companies in this
State is settled to be that of common carriers, and gen-
eral control thereof is placed in the railroad commission,
with power to make, alter, amend, or abolish any rate or
charge for public service.

2. CONSTITUTIONAL LAW—TELEPHONE COMPANIES—FIXING RATES—
LEGISLATIVE FUNCTION.

Exercising its legislative function over common carriers,
the State may fix the rates or charges for public service
by telephone companies.

3. SAME—REASONABLE RATES—JUDICIAL FUNCTION.

The judicial function is limited to determining whether any
particular rate fixed by the legislature or its duly author-
ized agency is reasonable or otherwise.

4. SAME—LEGISLATIVE AUTHORITY—DELEGATION—RAILROAD COM-
MISSION—MUNICIPAL CORPORATIONS.

It is competent for the legislature to delegate its control
over, and power to regulate charges of, common carriers
operating within the State to a board or commission cre-
ated for that purpose, and, within the range of legitimate
municipal purposes, to municipalities; but when such
power is delegated to a municipal corporation by its char-
ter it must be done in express terms.

5. MUNICIPAL CORPORATIONS — TELEPHONE COMPANIES — FIXING
RATES—POWER TO REGULATE STREETS.

Where no power is given a city by its charter in express
terms to fix rates to be charged by telephone companies
operating within its borders, such authority is not in-
ferable from the conferred power to regulate and control
the use of its streets by telegraph, telephone, and other
companies referred to.[1]

6. SAME—CONSTITUTIONAL LAW—COMMON CARRIERS—FRANCHISE
RIGHTS—CONTRACTS—AUTHORITY OF STATE TO FIX RATES.

A franchise contract entered into between a city and a tele-

[1] See note in L. R. A. 1915C, 287.

phone company is but permissive, and though binding upon the parties to it, is to be construed as having been entered into with reference to the right and power of the government to assert and exercise its inherent, paramount authority to fix the rates.

7. TELEGRAPHS AND TELEPHONES—COMMON CARRIERS—LOCAL ACTIVITY.

Where a telephone company in its connected corporate activities as a common carrier is not confined to a city or its immediate environments in its relations with the general public, it is not to be treated as a strictly local municipal activity independent of State regulation and control.

8. CONSTITUTIONAL LAW—COMMON CARRIERS—STATE CONTROL—IMPAIRMENT OF CONTRACTS.

Act No. 206, Pub. Acts 1913, authorizing the railroad commission to fix the rates to be charged by telephone companies, and the exercise of that power by the commission, increasing the rate fixed in the franchise of a telephone company, *held*, not to be in violation of the State and Federal Constitutions prohibiting impairment of contract obligations.

9. SAME — MUNICIPAL CORPORATIONS — TELEPHONE COMPANIES — FRANCHISE CONTRACT.

Sections 21 and 28, Art. 8, Const. 1909, *held*, not to affect the contract relations of a city and telephone company under a franchise granted and accepted before said Constitution was adopted; whatever rights the parties had under it as a permissive contract remaining.

10. SAME—STATE CONTROL.

Section 21, Art. 8, Const. 1909, giving cities the right to frame, adopt, and amend their charters and pass laws and ordinances relating to municipal concerns "subject to the Constitution and general laws of this State," does not confer upon a city paramount authority to assume, against a State agency acting under a general law of the State, the power to regulate rates to be charged by a telephone company operating within the city.

Appeal from Ingham; Wiest, J. Submitted June 19, 1918. (Docket No. 77.) Decided July 18, 1918.

Bill by the city of Traverse City against the Michi-

gan Railroad Commission and the Citizens' Telephone
Company to enjoin the fixing of telephone rates.
From a decree for defendants, plaintiff appeals. Af-
firmed.

*Parm C. Gilbert,* for plaintiff.

*Alex. J. Groesbeck,* Attorney General, and *Thomas
G. Baillie,* Assistant Attorney General, for defendant
railroad commission.

*Philip H. Travis (Travis, Merrick, Warner & John-
son,* of counsel), for defendant telephone company.

STEERE, J.   This controversy involves the validity
of an order by the Michigan railroad commission per-
mitting the Michigan Telephone Company to charge
and collect stated rates in excess of those specified in
its franchise contract with plaintiff under which the
telephone company had been operating.   It is a con-
tinuation of the differences between the municipality
and public utility company reported in *City of Trav-
erse City* v. *Telephone Co.,* 195 Mich. 373, to which
reference is made for a sufficient statement of the facts
and relations of the parties up to the time that case
was decided.

During the progress of that litigation it was the im-
pression of the trial court that the questions involved
more properly belonged in the first instance to the
State railroad commission than to the court, intimat-
ing the propriety of initiatory steps being taken by
application of one of the parties to that body, whose
action in the premises was reviewable by the courts as
provided by statute, but the suggestion was not acted
upon by the litigants at that time and the case was
pressed to a final hearing in this court.

After it had been decided in the lower court and was
pending on appeal to this court, the Citizens' Tele-

202—Mich.—37.

phone Company applied to the railroad commission for authority to make increased charges, on the ground that existing rates were inadequate to produce reasonable returns on investment and cost of operation. The city filed written objections to the application with the railroad commission claiming that the rates were controlled by a contract between the parties. Hearings were had upon the application while the chancery suit between the parties was pending in this court, but on the suggestion of counsel the commission withheld final disposition of the matter until after this court handed down its opinion in the chancery case, when, in July, 1917, an order was made by the commission authorizing the Citizens' Telephone Company to put into effect a new scale of rates for Traverse City, some of which were higher than those named in the ordinance contract, which had been the subject of litigation in the chancery suit and held by this court to be a binding contract between the litigating parties as the case then stood in that record.

The city thereupon filed a bill in the Ingham county circuit court in chancery to enjoin proceedings under such order, claiming that the railroad commission had no power to make the same. Answers were duly filed and the case brought to a hearing which resulted in a decree dismissing plaintiff's bill, and affirmance of the railroad commission's order, from which plaintiff has taken an appeal to this court.

The grounds upon which plaintiff attacks the order are, as stated in counsel's brief:

"The order of the Michigan railroad commission violates the terms of the franchise granted to the telephone company by the plaintiff city and accepted by the telephone company and under which the telephone company has always operated.

"The order of the Michigan railroad commission is void as being without consideration and because it deprives the city of all control and regulation over the

telephone company and takes the funds allowed under the new rates without consideration.

"The law under which the Michigan railroad commission claims authority to make this order is unconstitutional.

"The Citizens' Telephone Company is now estopped from seeking to collect or charge rates different from those named in the franchise.

"The order violates our Constitution, particularly as being opposed to the home rule provisions thereof."

Act No. 206, Pub. Acts 1913 (2 Comp. Laws 1915, § 6689 *et seq.*), under which the order in question was made, declares all persons, corporations and associations operating telephone lines or exchanges doing business in Michigan to be common carriers subject to all applicable laws regulating transportation of persons or property by railroad companies within the State. By it general control of all telephone lines and companies within the State is given to the Michigan railroad commission with ample powers, amongst which it is expressly authorized (section 6691),

"*   *   *   to make, alter, amend or abolish any rate or charge for any service, and may regulate by rules or orders any service or facility; and it shall likewise prescribe the standard of construction and equipment that shall be maintained by any person, copartnership or corporation maintaining a physical connection between the lines and facilities of any such person, copartnership or corporation, and the lines and facilities of any other person, copartnership or corporation."

This act committing to the commission control of telephone lines and companies as common carriers is similar in plan and provisions to statutes of other States prescribing the powers granted to, proceedings before, and duties of, public utility commissions in matters over which they are given control. It closely follows and, in effect, is a revision with amplifications of Act No. 138, Pub. Acts 1911, which was under con-

sideration and sustained to the extent questioned in *Home Telephone Co.* v. *Railroad Commission,* 174 Mich. 219, and in *Re Briggs,* 178 Mich. 28.

As indicated in the record of proceedings prior to this appeal and by plaintiff's brief, the reasonableness of the schedule of rates allowed by the commission is not involved but, as stated by its counsel to the commission, plaintiff's position is that the "rates are fixed by franchise" and the inquiry is limited to whether the commission possessed power to change the rates.

In *City of Traverse City* v. *Telephone Co., supra,* this court held that the telephone company was operating under an accepted franchise of the city which stood as a binding contract between the parties to it in the absence of the exercise of any paramount governmental authority, regardless of whether it was by absolute right of the parties to contract as to rates and inviolable or permissive only and subject to State control, it being said:

"Accepting it as permissive only, it remains valid between the parties until such time as the reserved State control is asserted and interposed against it. The statute conferring controlling powers upon the railroad commission does not of itself abrogate the contract."

This but followed the equitable rule applied in *City of Monroe* v. *Railway,* 187 Mich. 364, which is well supported by decisions in other jurisdictions. Although it was there said "plaintiff was not given by its charter express power to regulate rates," whether the contract was permissive only was not a controlling issue as the case then stood, but the State authority having been appealed to and since asserted in disregard of this contract, it becomes material to authoritatively determine its character in that particular.

The status of telephone companies, recognized at

common law as analogous to common carriers, and sometimes held to be such, is settled in this State by the statute so classifying them. That the State may regulate charges of common carriers, and the power to fix the rates which they may charge the public for their services is a legislative and not a judicial function, is now elemental; the judicial function, or power of the courts, being limited to determining whether any particular rate fixed by the legislature or its duly authorized agency is reasonable or otherwise.

Neither the railroad commission nor the municipality had any rate-making power except that which the legislature might delegate to them to exercise as State agencies. There is no doubt that it is competent for the legislature to delegate its control' over and power to regulate charges of common carriers operating within the State to a board or commission created for that purpose, and, within the range of legitimate municipal purposes, to municipalities, but when such power is delegated to a municipal corporation by its charter it must be done in express terms. *City of Jacksonville* v. *Telegraph Co.*, 57 Fla. 374; *City of St. Louis* v. *Telephone Co.*, 96 Mo. 623. No power is given Traverse City by its charter in express terms to fix rates to be charged by telephone companies operating within its borders, nor is such authority inferable from the conferred power to regulate and control the use of its streets by telegraph, telephone, and other companies referred to, and quoted so far as material, in *City of Traverse City* v. *Telephone Co., supra.* This subject will be found to have been so exhaustively discussed in its various aspects and the applicable rule so plainly declared in the above cases and those cited in them that it is sufficient here to state we need not go to the extent of many of those decisions to determine in the instant case that Traverse City was not given by its charter the power to

regulate the rates to be charged by telephone companies, that the franchise contract upon which it relies was but permissive, and, though binding between the parties to it in the absence of governmental interposition, is to be construed as having been entered into with reference to the right and power of the government to assert and exercise its inherent, paramount authority. *Home Telephone Co.* v. *City of Los Angeles,* 211 U. S. 265; 28 Cyc. p. 724, where numerous authorities on the subject are cited.

This general principle is very plainly stated by Justice Day in the recent case of *Milwaukee Electric R. Co.* v. *Railroad Com'n,* 238 U. S. 174, as follows:

"No specific authority having been conferred on the city to enter into the contract in question, the right of the State to interfere whenever the public weal demanded was not abrogated. The contract remained valid between the parties to it until such time as the State saw fit to exercise its paramount authority, and no longer. To this extent and to this extent only, is the contract before us a valid subsisting obligation. It would be unreasonable to hold that by enacting section 1862, statutes of 1898, * * * the State intended to surrender its governmental power of fixing rates. That power was only suspended until such times as the State saw fit to act."

In the case of *Michigan State Telephone Co.* v. *Railroad Com'n,* 193 Mich. 515, an order was granted by the commission on petition of certain citizens of Traverse City "who are said in their application to represent a large number of their fellow townsmen;" requiring this defendant Citizens' State Telephone Company and the Michigan State Telephone Company to make physical connections. On review at the instance of the Michigan State Telephone Company in the circuit court of Wayne county the action of the commission was sustained, and the decree affirmed in this court.

Though not entirely in point upon the questions raised here, that case involved in certain particulars the constitutionality and scope of Act No. 206 of 1913, and makes clear that the Citizens' Telephone Company, in its connected corporate activities as a common carrier, is not confined to Traverse City or its immediate environments nor in its relations with the general public to be treated as a strictly local municipal activity independent of State regulation and control. Along those lines the opinion of Justice PERSON is illuminating as to the authority, duties, right of interference and regulation vested in the commission as a State agency to meet the demands of public necessity and convenience under the paramount power of the State, touching to a greater or less extent many of the constitutional objections now raised by plaintiff. Although it is broadly charged in counsel's brief that the law under which the commission claims authority to act is unconstitutional as a whole, the objections urged and questions raised are rather directed against the scope of the order claimed to violate the Constitution in certain specified particulars than against the constitutionality of the law itself in its entirety, which we regard as too well settled to demand discussion now.

Upon plaintiff's claim of estoppel and contention that this order violates provisions of the State and Federal Constitutions which prohibit impairment of contract obligations, a case arose in the State of Georgia closely analogous in form and facts to the instant case. The city there sought by injunction to restrain putting in operation an order of the State railroad commission made upon application of a telephone company operating under a franchise from the city, accepted in writing, permitting it to charge rates in excess of those fixed by the franchise. As here, a statute of that State gave its railroad commission

power to fix the rates to be charged by telephone companies for service within the State. It was there said:

"The granting of a franchise to a telephone company by an ordinance passed by the municipal authorities of a city, wherein it is provided that the company 'agrees and binds itself by this ordinance that the rates charged shall be $1.50 per month for residence phones and $2.50 per month for business phones,' and an acceptance of such franchise by the company, does not prevent the telephone company from increasing such charges, if permission to do so is subsequently granted it by the railroad commission; especially as it appears that the city was not specifically authorized by its charter, or other legislative enactment, to fix the charges to be made by telephone companies. * * * The order of the railroad commission does not violate the provisions of the State and Federal Constitutions, prohibiting the impairment of the obligations of contracts." *City of Dawson v. Telephone Co.*, 137 Ga. 62.

We are unable to follow plaintiff's contention that the provisions of sections 21 and 28, article 8, of our last Constitution, of 1909, affect the relations of the city and telephone company as previously established. The franchise upon which plaintiff relies was granted, accepted and acted upon long before the present Constitution was adopted, and whatever rights the parties had under it as a permissive contract remain. *City of Lansing v. Power Co.*, 183 Mich. 400. Neither do the questions raised here pertain to the control of streets but to control of rates to be charged the public by a common carrier doing business under a franchise. If those rates were subject to governmental control irrespective of a permissive contract they so continued, for the right of the State under its police power to regulate the charges to the public by common carrier does not depend upon or arise out of their use of or right to use the highways in cities or elsewhere.

Neither does the so-called "home rule" feature of our present Constitution (section 21, article 8) giving cities the right to frame, adopt, and amend their charters and pass all laws and ordinances relating to their municipal concerns, "subject to the Constitution and general laws of this State," confer upon them, as an incident of a grant of power to frame a charter for city government, paramount authority to assume against a State agency, acting under a general law of the State, those powers which the State originally possessed and has reserved to itself in matters of general concern, for protecting the rights and regulating the duties of its citizens wherever located within its boundaries; and the power to regulate rates to be charged by common carriers is a matter of general concern which does not pertain solely to municipal affairs.

The scope of constitutional authority conferred on cities to frame charters for their own government is well outlined in *City of St. Louis* v. *Telephone Co.,* *supra,* and *State, ex rel. Garner,* v. *Telephone Co.,* 189 Mo. 83, both of which involved a question of rates which the cities claimed under their charters the right to fix and enforce.

The constitution of the State of Oregon contains a provision granting to the legal voters of every city power to enact and amend its charter, subject to the Constitution and criminal laws of the State, and forbids its legislature to amend and repeal municipal charters. Of this constitutional right of home rule it is said in *Coleman* v. *La Grande,* 73 Or. 521:

"By granting and reserving to the people of municipalities the power to enact and amend their charters and adopt local or special laws, the State has not surrendered her sovereignty to the municipalities. Within their boundaries cities are clothed with power to regulate matters purely local. However, a city is not constituted as a sovereignty as regards all matters of

legislation, but is still to a certain extent a mere agency of the State of which it is a part. Beyond such municipal boundaries and in matters of general concern not pertaining solely to local municipal affairs, cities are amenable to the general laws of the State, which do not infringe upon the right of cities to local self-government."

In the recent case of the *City of Woodburn* v. *Public Service Com'n*, 82 Or. 114 (161 Pac. 391), the city of Woodburn contested the right of the State by its public service commission to change the telephone rates which the common council had fixed in a franchise authorized by a provision of its charter adopted under the home rule section of the State constitution. In a carefully considered opinion by Justice Harris, where a large number of leading cases upon the various questions involved are cited, it is said upon the contention that the local rates charged are purely a matter of local concern:

"It is true that the regulation of the rates for telephones in Woodburn may not immediately affect the pocket-books of all the people of the whole State any more than does the prosecution of a person in a justice court for assault and battery, when taken alone and by itself, directly affect all the people of the whole State, and yet the State is just as much interested in promoting the comfort and general welfare of all the people as in preserving peace for all the people. In these modern times, when the activities of public utilities are not always confined to a single city, the people are especially concerned in the retention of the right to adjust rates to changing conditions, so that no person may be discriminated against and all may receive adequate service at reasonable rates, and at the same time affording sufficient returns to the public utility. The State guards its right to regulate so vigilantly that specific authority is necessary to compel a surrender of this element of sovereignty and in the language of the Supreme Court of the United States: 'The general powers of a municipality or of any other political subdivision of the State are not sufficient.' Citing

*Home Telephone Co.* v. *City of Los Angeles,* 211 U. S. 265; *Milwaukee Electric R.* v. *Railroad Com'n,* 238 U. S. 174."

And in denying the relief asked the following conclusions are reached, which we think are well sustained by the authorities referred to and applicable in the instant case:

"The power of the State to regulate rates by compulsion is a police power, and must not be confused with the right of a city to exercise its contractual power to agree with a public service company upon the terms of a franchise. The exercise of a power to fix rates by agreement does not include or embrace any portion of the power to fix rates by compulsion. When Woodburn granted the franchise to the telephone company, the city exercised its municipal right to contract, and it may be assumed that the franchise was valid and binding upon both parties until such time as the State chose to speak; but the city entered into the contract subject to the reserved right of the State to employ its police power and compel a change of rates, and when the State did speak, the municipal power gave way to the sovereign power of the State: (Citing cases). The power to fix rates by compulsion as distinguished from the power to fix rates by agreement is not granted to cities or towns, nor is the right of the legislative assembly to legislate upon that subject curbed by Article 11, section 2, of the State constitution because in its essence it is neither a municipal power nor an incident to a pure municipal power, and therefore, * * * the legislative assembly was not prohibited from making the public utility act applicable to urban as well as extra-urban territory."

The decree of the lower court will stand affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.