TCG DETROIT v CITY OF DEARBORN

Docket No. 232609. Submitted April 14, 2003, at Detroit. Decided March 4, 2004, at 9:10 A.M.

TCG Detroit brought an action in the Wayne Circuit Court against the city of Dearborn, seeking a declaratory judgment and injunctive relief on the basis that the city violated the Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.*, with respect to the issuance of permits and the fees pertaining thereto for the plaintiff's access to public rights-of-way in Dearborn for the placement of fiber optic telecommunication cables. The city counterclaimed, seeking past due franchise fees or the ejection of the plaintiff from the rights-of-way if the fees are not paid. The city moved for summary disposition, alleging that portions of article 2A of the MTA, MCL 484.2251-484.2254, infringe on the city's franchising rights derived from Const 1963, art 7, § 29. The court, Gershwin A. Drain, J., denied the motion. The court also granted in part and denied in part the plaintiff's motion for summary disposition, ruling that the challenged portions of the city's telecommunications regulatory ordinance did not violate the MTA, but portions of a draft franchise agreement between the parties did violate the MTA. The city appealed.

The Court of Appeals *held*:

1. A city has the implied power to contract for rates to be charged consumers as a condition of granting consent for the use of its rights-of-way. However, that implied power must give way to the state's legislative power to set rates when the state exercises that power. Where the activity being conducted on a city's rights-of-way is purely local, the city retains broad authority over the terms of its consent, although it may not unilaterally impose a fee after a grant of consent has expired.

2. Where the Legislature has occupied the field, a city retains only such power as is strictly referable to the reasonable control of its streets, which does not include the power to prohibit the activity. If the city charges a fee, it must be based on the expense to the city of issuing a license and of supervising the activity, if supervision is required. Even where the consent of the city is required, consent cannot be denied arbitrarily or unreasonably.

3. The city's constitutional right to the reasonable control of its streets carries with it the implied power to contract for reasonable terms as a condition of allowing use of the streets. However, this implied power must be exercised by entering into contracts with providers, not by unilaterally imposing the terms of the grant of consent. The implied power to contract is subject to the superior legislative powers of the state. Local governments cannot contract for fees that conflict with fees set by the state. The state has the power to set the fees that can be charged nonlocal businesses, and the imposition of a fixed and variable cost fee structure by the state does not infringe on a city's right to the reasonable control of its streets.

4. The extent of the city's right is that it may require as a condition of consent that a reasonable fee be paid, and may withhold consent from those who do not agree to pay the reasonable fee.

5. The implied authority to exact fees through contract is not tantamount to an unqualified right to negotiate any fee that can be regarded as reasonable, without legislative constraint on the terms of the fee. The Legislature can set the fees as long as it does not impermissibly infringe on the city's right to grant or withhold consent.

6. The trial court adhered to the language in MCL 484.2253 tying "fixed and variable costs" to the city's costs in granting a permit and maintaining the rights-of-way used by a provider.

7. The trial court properly recognized that the burden was on the plaintiff to establish that the city's percentage-of-gross-revenue fee exceeded the city's fixed and variable costs in granting the permit and maintaining the rights-of-way used by the plaintiff. There was no misallocation of the burden of proof.

8. The fixed and variable costs are not limited to those that can be specifically attributed to the incremental increase caused by the plaintiff's use of the rights-of-way. The court did not err in rejecting the city's figures as not reflecting the fixed and variable costs contemplated by § 253. The court did not err in accepting the figures presented by the plaintiff's experts.

9. Const 1963, art 7, § 29 does not grant a local unit of government the right to be free from legislative limitations on the amount it can charge for the use of its rights-of-way. Because the city advanced a percentage-of-revenue fee approach without determining whether the percentage of revenue sought correlated to the plaintiff's use of the rights-of-way, the court did not err in holding that that fee approach did not meet the requirements of § 253.

Affirmed.

WILDER, J., concurred with the holding of the majority that § 253 does not violate Const 1963, art 7, § 29, but would hold that the trial court improperly interpreted and applied § 253 to require a substantial nexus between the fee the defendant charged the plaintiff and the costs incurred by the defendant to maintain its rights-of-way, easements, or public places attributed to use by the plaintiff. The trial court erred in imposing the burden of proof on the defendant. The trial court erred in applying § 253 to limit the fee imposed to incremental or marginal costs. The statutory scheme allows a fee based on not just the cost attributable to a particular use of the rights-of-way, easements, and public places by a provider, but on the costs of maintaining the rights-of-way, easements, and public places used by a provider. The trial court abused its discretion in excluding relevant evidence offered by the city regarding the proper apportionment of costs.

*Clark Hill PLC* (by *Roderick S. Coy, Michael P. Calabrese,* and *Richard C. Marsh*) and *Peggy Nelson* for the plaintiff.

*Debra A. Walling, John W. Tanner, III,* and *William H. Irving,* and *Miller & Van Eaton, P.L.L.C.* (by *William Malone, John F. Noble,* and *Holly L. Saurer*), for the city of Dearborn.

Amici Curiae:

*Loomis, Ewert, Parsley, Davis & Gotting, P.C.* (by *Harvey J. Messing, Gary L. Field, Lisa A. Hanson,* and *Michael C. Rampe*), for the Telecommunications Association of Michigan.

*Kitch Drutchas Wagner DeNardis & Valitutti* (by *Michael J. Watza, Susan Healy Zitterman,* and *Christina A. Ginter*) for PROTEC.

Before: SMOLENSKI, P.J., and WHITE and WILDER, JJ.

WHITE, J. Defendant City of Dearborn (Dearborn) appeals as of right the order denying its motion for summary disposition, which challenged the constitutionality of certain provisions of the Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.*, article 2A of which has since been repealed,[1] and the court's rulings regarding what constitutes "fixed and variable costs" thereunder. We affirm.

---

[1] Neither party raised this in supplemental briefing, but we note that article 2A of the MTA, MCL 484.2251-484.2254, was repealed in 2002, during the pendency of this appeal, and that a new act, the Metropolitan Extension Telecommunications Rights-of-Way Oversight Act, codified at MCL 484.3101 *et seq.*, took effect on November 1, 2002. Subsection 1(2) of the new act states:

The purpose of this act is to do all of the following:

(a) Encourage competition in the availability, prices, terms, and other conditions of providing telecommunication services.

(b) Encourage the introduction of new services, the entry of new providers, the development of new technologies, and increase investment in the telecommunication infrastructure in this state.

(c) Improve the opportunities for economic development and the delivery of telecommunication services.

(d) *Streamline the process for authorizing access to and use of public rights-of-way by telecommunication providers.*

(e) *Ensure the reasonable control and management of public rights-of-way by municipalities within this state.*

(f) *Provide for a common public rights-of-way maintenance fee* applicable to telecommunication providers.

(g) Ensure effective review and disposition of disputes under this act.

\* \* \*

(j) Create an authority to coordinate public right-of-way matters with municipalities. [MCL 484.3101(2). Emphasis added.]

I

The facts as stated in the circuit court's opinion denying defendant's motion for summary disposition are not in dispute:

> TCG is licensed by the Michigan Public Service Commission to provide local telecommunications services within the City [of Dearborn]. Its chief competitor in providing local telecommunications services within the City is Ameritech, who is the incumbent local exchange carrier. However, TCG does not possess any telecommunications facilities within the City. TCG sought, through an agreement with Detroit Edison, to install fiber optic cable in existing Edison ducts. These, however, lie in the City's rights of way.
>
> Sometime in early 1994, the City was informed of TCG's plan to install fiber optic cable in the Edison ducts. By this time approximately seven out of a planned twenty-seven miles of fiber optic cable within Edison's existing conduit had been installed in the City. The City objected and asserted, as it presently does, that TCG needed to enter into a franchise agreement with the City before entering into the City's right of ways [sic] to install telecommunications facilities, such as fiber optic cable. Thereafter TCG negotiated with the City to enter into a franchise agree-

Section 3 of the new act provides that the oversight authority is established as an autonomous agency, that the director of the authority shall be appointed by the governor. Subsection 3(3) provides that

[t]he authority shall coordinate public right-of-way matters with municipalities, *assess the fees required under this act, and have the exclusive power to assess fees* on telecommunication providers owning telecommunication facilities in public rights-of-way within a municipality in a metropolitan area *to recover the costs of using the rights-of-way by the provider.* [MCL 484.3103(3). Emphasis added. See also n 8.]

ment that would enable TCG to use the City's rights of way.
During this time the City adopted its Telecommunications
Ordinance [.]

By September 1995, the parties nearly reached an
agreement. The proposed agreement required TCG to pay
the City a franchise fee of 4% of TCG's gross revenues, a
$50,000 one time payment, and up to $2500 of the costs
incurred by the City in connection with its granting the
franchise. Also under the proposed agreement, TCG, if it
should ever install its own conduit within the City, would
also install, at its own cost, an inner conduit for use by the
City. Finally, the proposed agreement contained a "most
favored nation" clause under which TCG would be obli-
gated to pay the City, at its election, a higher percentage of
revenue in the event TCG agreed to pay a higher percent-
age to any other municipality within the tri-county area.

The parties continued to negotiate over the resolution of
some apparently minor details when, on November 30,
1995, under 1995 PA 216, MCL 484.2101 *et seq.*, the revised
provisions of the Michigan Telecommunications Act (the
Act) took effect. Based on the provisions of the Act, TCG
took the position that it no longer needed to enter into a
franchise agreement with the City. TCG maintained that
upon its complying with the provisions of the Act, the City
was required to issue a permit for the use of its rights of
way. Further negotiations ultimately came to an impasse
and this case followed.

PROCEDURAL POSTURE

In September 1996, plaintiff TCG filed a complaint
against Dearborn in the United States District Court
for the Eastern District of Michigan seeking a declara-
tory ruling, an injunction, and damages, and alleging
that Dearborn had violated § 253 of the Federal Com-
munications Act (FCA), 47 USC 151 *et seq.*, and article
2A of the MTA, by failing to allow TCG access to public
rights-of-way in Dearborn for placement of fiber optic
cables. The district court dismissed the state law claims

without prejudice. With regard to the federal claim, the court found that the fees Dearborn sought (the same fees it initially sought in the instant case, i.e., four percent of TCG's gross revenues, a one-time charge of $50,000, and the requirement that if TCG installed its own conduit in the rights-of-way, it do so for the city as well) were "fair and reasonable" under subsection 253(c) of the FCA, which provides that local governments retain authority "to require fair and reasonable compensation from telecommunications providers," for use of a public right-of-way. *TCG Detroit v Dearborn,* 16 F Supp 2d 785, 788-791 (ED Mich, 1998), aff'd 206 F3d 618 (CA 6, 2000).

TCG refiled the state law counts in February 1998, in a seven-count complaint for declaratory judgment and an injunction. Counts I, II, and III allege violation of the MTA by failure to issue a permit, failure to limit permit conditions as necessary to manage rights-of-way, and failure to limit fees and assessments to Dearborn's fixed and variable costs, respectively. TCG sought a declaration that Dearborn's Telecommunications Regulatory Ordinance[2] is invalid because it is contrary to the MTA, and that Dearborn may not require TCG to enter into a franchise agreement or pay the franchise fees Dearborn demanded.

Dearborn counterclaimed, seeking past due franchise fees and TCG's ejection from its rights-of-way should it fail to pay Dearborn the fees sought.

Dearborn filed a motion for summary disposition asserting that portions of article 2A of the MTA are unconstitutional in that they impermissibly impinge on Dearborn's franchising rights derived from Const 1963, art 7, § 29. The circuit court denied Dearborn's motion,

---

[2] Telecommunications Regulatory Ordinance No. 94-605 regulated "the granting of franchises for telecommunications systems."

concluding that the MTA could be construed consistently with art 7, § 29. Dearborn's motion for partial reconsideration was denied.

TCG moved for summary disposition, arguing that portions of Dearborn's 1994 ordinance violated the MTA, and that certain provisions of the draft franchise agreement Dearborn and TCG had nearly agreed on infringed on the Michigan Public Service Commission's power and authority and violated the MTA. The court[3] granted TCG's motion in part and denied it in part, concluding that the challenged portions of Dearborn's ordinance did not violate the MTA, but that portions of the draft franchise agreement did. The rulings on TCG's motion have not been appealed.

II

We first address Dearborn's argument that § 253 of the MTA, MCL 484.2253, which provides that a local government may not exact compensation for telephone companies' access to its rights-of-way in excess of its "fixed and variable costs . . . in granting a permit and maintaining the right-of-ways, easements, or public places used by a provider," impermissibly impinges on the grant of authority to local governments provided in Const 1963, art 7, § 29.

A

The constitutionality of § 253 of the MTA presents a question of law that this Court reviews de novo. *Tolksdorf v Griffith,* 464 Mich 1, 5; 626 NW2d 163 (2001). "[A] statute is presumed to be constitutional unless its unconstitutionality is clearly apparent." *McDougall v*

---

[3] Judge Marianne O. Battani presided over the case until June 2000, thereafter Judge Gershwin A. Drain presided.

*Schanz,* 461 Mich 15, 24; 597 NW2d 148 (1999). The constitutionality of a statute must be determined on the basis of the provisions of the act itself. *Judicial Attorneys Ass'n v Michigan,* 459 Mich 291, 303; 586 NW2d 894 (1998). The party challenging the constitutionality of the statute has the burden of proving the invalidity of the statute. *In re Trejo Minors,* 462 Mich 341, 355; 612 NW2d 407 (2000). The constitutionality of a statute will ordinarily not be considered unless it is essential to the disposition of the case. *Trent v Suburban Mobility Auth for Regional Transportation,* 252 Mich App 247, 252; 651 NW2d 171 (2002).

Const 1963, art 7, § 29 provides:

> No person, partnership, association or corporation, public or private, *operating a public utility* shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other utility facilities, *without the consent of the duly constituted authority* of the county, township, city or village; *or to transact local business therein without first obtaining a franchise* from the township, city or village. Except as otherwise provided in this constitution the right of all counties, townships, cities and villages to *the reasonable control* of their highways, streets, alleys and public places *is hereby reserved to such local units of government.* [Emphasis added.]

The predecessor provision, Const 1908, art 8, § 28, provided:

> No person, partnership, association or corporation operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any city, village or township for wires, poles, pipes, tracks or conduits, without the consent of the duly constituted authorities of such city, village or township; nor to transact a local business therein without first obtaining a franchise therefor from such city, village or township. The right of all cities, villages and townships to the reasonable control of

their streets, alleys and public places is hereby reserved to such cities, villages and townships.

Article 2A of the MTA, MCL 484.2251-484.2253, provided at pertinent times (see n 1):

### ARTICLE 2A

Sec. 251. (1) Except as provided in subsections (2) and (3), a local unit of government shall grant a permit for access to and the ongoing use of all right-of-ways, easements, and public places under its control and jurisdiction to providers of telecommunication services.

(2) This section shall not limit a local unit of government's right to review and approve a provider's access to and ongoing use of a right-of-way, easement, or public place or limit the unit's authority to ensure and protect the health, safety, and welfare of the public.

(3) A local unit of government shall approve or deny access under this section within 90 days from the date a provider files an application for a permit for access to a right-of-way, easement, or public place. A provider's right to access and use of a right-of-way, easement, or public place shall not be unreasonably denied by a local unit of government. A local unit of government may require as a condition of the permit that a bond be posted by the provider, which shall not exceed the reasonable cost, to ensure that the right-of-way, easement, or public place is returned to its original condition during and after the provider's access and use.

Sec. 252. Any conditions of a permit granted under section 251 shall be limited to the provider's access and usage of any right-of-way, easement, or public place.

Sec. 253. Any fees or assessments made under section 251 shall be on a nondiscriminatory basis and *shall not exceed the fixed and variable costs to the local unit of government in granting a permit and maintaining the right-of-ways, easements, or public places used by a provider.* [Emphasis added.]

B

We first observe that Dearborn does not argue that the MTA violates Const 1963, art 7, § 29 because it impermissibly compels local units of government to grant a use permit, and thus consent. Rather, Dearborn argues that included in a local government's right to grant or withhold a use permit or consent is the right to exact reasonable compensation therefor, that local units of government retain autonomous proprietary authority over their rights-of-way, and that the Legislature may not restrict their authority to charge any reasonable compensation for the use of those rights-of-way. We do not agree.

Const 1963, art 7, § 29 has three clauses. The first states that public utilities cannot use the rights-of-way of local units of government for wires, poles, conduits, and so forth without consent; the second clause forbids a utility from conducting local business without first obtaining a franchise; and the third clause declares that local units of government retain the right to reasonably control their highways, streets, alleys, and public places.

The circuit court concluded that Dearborn had failed to show how the MTA violates the second clause (regarding franchises) and the third clause ("reasonable control" proviso). Dearborn did not explicitly argue below that the MTA violates the first provision (regarding consent). The circuit court rejected Dearborn's constitutional challenge, concluding that "article 2A of the [MTA] concerning the extent to which municipalities may attach conditions to permits to telecommunication providers for access and use of public rights-of-way was a valid exercise of legislative power and not invalid under Art 7, § 29."

C

The constitutional provision at issue first appeared in Const 1908, art 8, § 28. Before 1908, the matter was addressed through statutes, e.g., cities were granted rights to grant franchises for public utilities, and state statutes providing for public utility rights-of-way required local consent.[4] Most of the cases addressing Const 1963, art 7, § 29 and its predecessor concern the third clause ("reasonable control" proviso). Many of the cases concern a city's authority to set the rates charged by the public utility provider, rather than the amount the city can charge the provider as a condition of consent.

While art 7, § 29 has been discussed in many cases, no case directly addresses the consent clause in the context presented here. Nevertheless, the cases assist in understanding the scope and operation of art 7, § 29.

1

*Boerth v Detroit City Gas Co,* 152 Mich 654; 116 NW 628 (1908), concerned events that preceded the 1908 Constitution, but set forth principles relied on in later cases. In *Boerth,* the city had entered into a contract with the gas company that was then made the subject of an ordinance. The contract/ordinance granted the defendant the right, for thirty years, to lay its gas pipes in the city and provided that the defendant could not charge more than ninety cents per thousand cubic feet. A customer brought suit, asserting that the defendant's charge to him of eighty cents per thousand cubic feet was unlawful and discriminatory because others were

---

[4] See cases discussed later in this opinion, including *Boerth v Detroit City Gas Co,* 152 Mich 654; 116 NW 628 (1908), and *City of Niles v Michigan Gas & Electric,* 273 Mich 255; 262 NW 900 (1935).

charged less. The question was whether the city had the authority to grant the defendant the right to charge eighty cents per thousand cubic feet. The city charter granted the city the right to control, prescribe, and regulate the manner in which the highways and rights-of-way within the city shall be used and to provide for and regulate the lighting of the avenues, streets, alleys, and so forth. The state statute provided:

> "Any corporation formed under this act . . . shall have full power to manufacture . . . and sell . . . gas . . . and shall have power to lay conductors for conducting gas . . . through the streets, lanes, or squares of any city, town or village where said corporation is located, or carrying on its business, . . . . which pipes or conductors shall be laid with the consent of the municipal authorities of such cities, townships or villages through which the same are laid under such reasonable regulations as they may prescribe." [*Id.* at 656-657, quoting 2 Comp Laws 7123.]

The Court reasoned that the city had broad powers, in that without its consent a gas company cannot lay its pipes in the streets. The city may refuse to grant that consent, and may attach conditions to its consent. The statute does not say what conditions are permissible, only that they must be reasonable. The Court found that it was not unreasonable to prescribe rates as a condition of the grant of consent. The Court considered whether the authority to prescribe rates can be implied as an incident to the authority to attach conditions to its consent. The complainant argued that the power of a municipality to prescribe rates could not be found to exist by implication. The Court held that the principle that there is a strong presumption against the grant of legislative authority had no application to the case because it was not alleged that the city had the *legislative* authority to set rates, only that it had the *power to*

*contract* for rates. The Court upheld the city's right to enter into a contract setting the rates.

In *Kalamazoo v Kalamazoo Circuit Judge,* 200 Mich 146; 166 NW 998 (1918), the gas company was incorporated under state law. In 1894, it applied to the city for consent to lay mains and services in the streets. An ordinance was passed granting such consent, which included various conditions and fixed the price to be charged consumers. It granted consent for twenty-two years (until July 14, 1916). The ordinance was accepted by the gas company. Shortly before the consent was about to expire, the city investigated the cost of producing gas and passed an ordinance, to become effective August 1, 1916, that set new gas rates and penalties for violation of the ordinance. The new gas rates were lower than the original rates. The gas company continued to charge rates that were lower than those set in the original ordinance, but higher than those set in the 1916 ordinance. The city sought to enforce the penalty for violating the ordinance.

The Court first quoted Const 1908, art 8, § 28, and, without discussion, stated that the last sentence was in issue (the "reasonable control" proviso). The Court observed that the case law from other states was not in harmony. It quoted from Missouri and Wisconsin cases that held that the right to impose reasonable regulations on the use of the streets related to the planting of poles and the stringing of wires and the like, and not to the regulation of rates charged by the utility. The Court stated, however, that it had previously adopted a contrary view, citing *Boerth, supra,* and had held, "prior to the adoption of the present Constitution, that language quite similar to that here under consideration permitted the city of Detroit to attach conditions to its consent to the use of its streets by a gas company, and that as a

condition it might fix reasonable rates." *Kalamazoo Circuit Judge, supra,* 200 Mich at 152. The Court cited cases from other states in accord. The Court observed, however, that in *Boerth,* the issue was the right to contract for such rates, referred to as the administrative power of municipalities, as distinguished from the legislative power to set rates unilaterally. The Court went on to discuss the difference between administrative or proprietary powers and legislative powers in the context of a municipality. The Court determined that *the legislative power to fix rates was not delegated to the city by the constitutional provision* and that the charter did not so provide. The Court concluded that the *city had the right to contract for rates as a condition for using the streets, but it could not enact an ordinance fixing rates to be enforced by penalties.* The Court then stated that it did not have before it, and did not pass on, the issue of the rights municipalities might have under home-rule charters.

In *Kalamazoo v Titus,* 208 Mich 252; 175 NW 480 (1919), the city sought to enforce another ordinance, adopted in 1918. By then the city had a home-rule charter authorizing it to regulate the rates of public utility companies using its streets in cases where the franchise had expired. The 1918 ordinance provided for the regulation of the sale of gas in Kalamazoo and included rate and penalty provisions. The city alleged that the gas company charged in excess of the rate provided by the ordinance and operated its plant and used the streets without regard to the provisions of the ordinance and without obtaining any permission or authority from the city. The circuit court determined that the ordinance was invalid because it was legislative in character and the city did not have the power to enact it. On appeal, the Supreme Court extensively discussed the relationship between state and local gov-

ernments, the rights of municipalities, and the import
of the new constitutional provisions involving munici-
palities, and affirmed. The Court stated:

> With regard to the subject we are considering, the
> impressive thing about these constitutional provisions is
> that they recognize and affirm the theory that cities owe
> their origin and their powers to the legislature. And while
> cities may refer power to do some things, as, for example,
> power to acquire certain public works, directly to some of
> these constitutional provisions, it must be admitted that all
> of these provisions should be considered with reference to
> the fact that legislative power is vested in the legislature
> and that the Constitution recognizes, as former Constitu-
> tions have recognized, the general control of the legislature
> over cities. That the legislative power ought to be exercised
> in such manner as to preserve the right of local self-
> government is a doctrine which in application in no way
> modifies or qualifies the idea of the general legislative
> power of creation and control. [*Id.* at 265.]

In *Traverse City v Citizens' Tel Co*, 195 Mich 373; 161
NW 983 (1917), the city, in 1898, had entered into a
thirty-year franchise, allowing the defendant's assignor
to install poles, wires, and so forth, that included set
rates to be charged its users. In 1914, the defendant
began to charge rates in excess of that allowed by the
franchise. *Id.* at 381. The city sought injunctive relief.
The defendant argued, inter alia, that the matter
should be addressed to the state railroad commission,
which was granted authority over telephone lines under
1911 PA 138. The Court held that the defendant's right
under its primary franchise from the state to use
highways for the extension of its lines did not relieve it
from contractual obligations arising from a secondary
franchise granted by the city.

> The right conferred by the general law upon telephone
> companies to use highways of the State as avenues of

communication for their methods of transmitting messages and to establish their lines along them for that purpose does not confer the unrestricted right to invade cities and villages and erect their poles or string their wires where and as they may find it most economical or convenient. While the municipalities may not annul the general statute by arbitrarily refusing to permit the use of their streets to telephone companies, they may have under their charters, as in the instant case, controlling authority within reasonable limits, in the exercise of their police power, to direct upon which streets and in what manner the lines shall be installed . . . . [*Citizens' Tel, supra,* 195 Mich at 382-383. Citations omitted.]

The dispute continued in *Traverse City v Michigan Railroad Comm,* 202 Mich 575; 168 NW 481 (1918). While the first Traverse City case was on appeal to the Supreme Court, Citizens' Telephone Company applied to the railroad commission for authority to increase its charges beyond that set forth in its contract with the city. Authority to do so was granted to the telephone company, and the city sought an injunction from the circuit court. The circuit court dismissed the case and the city appealed. *Id.* at 577-578. The state statute provided that the commission had the authority

"to make, alter, amend or abolish any rate or charge for any service, and may regulate by rules or orders any service or facility; and it shall likewise prescribe the standard of construction and equipment that shall be maintained by any person, copartnership or corporation maintaining a physical connection between the lines and facilities of any such person, copartnership or corporation, and the lines and facilities of any other person, copartnership or corporation." [*Id.* at 579, quoting 2 Comp Laws 1915, § 6691.]

The Supreme Court affirmed, holding that the legislative authority to set rates superceded the implied permissive authority of the city to contract for rates, and that the contract was made subject to that legislative

authority being exercised in the future. *Michigan Railroad Comm, supra,* 202 Mich at 587.

In *City of Niles v Michigan Gas & Electric Co,* 273 Mich 255; 262 NW 900 (1935), an 1895 statute granted the city the right to contract with an entity, from year to year or for a period not exceeding ten years, for the provision of light to the city. The 1908 Constitution was then adopted, and in 1913 the city granted a thirty-year franchise to the defendant, which provided for a charge of one dollar per thousand cubic feet of gas. The 1908 Constitution, in art 8, § 25, provided that no city shall grant any public utility franchise that is not subject to revocation at the will of the city, unless such proposition is first approved by 3/5ths of the electors, and also provided, in art 8, § 29, that no franchise or license shall be granted by any municipality for a period longer than thirty years. Const 1908, art 8, § 28, the predecessor of the section involved here, stated that no public utility has the right to use the highways for wires, poles, conduits, and so forth without the consent of the city, nor to transact a local business without first obtaining a franchise. The 1913 franchise ordinance was approved by the electors. In 1918 and 1920, the city adopted ordinances, and in 1932, the city adopted a resolution, increasing the price that could be charged for gas. The city then commenced an action to set aside the ordinances and resolution as illegal and to restore the 1913 rate. The majority concluded that the 1908 Constitution did not repeal the 1895 statute's ten-year limitation on franchises. Citing *Boerth, supra,* the Court held that the provisions in § 28 regarding municipal control over streets, alleys, or other public places carried with them an authority over public utility rates as a condition of using the streets, but observed, citing *Traverse City, supra,* that the implied power to fix rates under § 28 is inoperative when the Legislature exercises its

reserved power. The Court further stated that under a city's powers implied from § 28, the city, if there were no statute, could not make an irrevocable thirty-year contract for rates even by vote of the electors because such contract would be subject to annulment by legislative exercise of the superior power. *Niles, supra,* 273 Mich at 264. The dissenting justices would have held that the municipal electors had the power to grant a thirty-year franchise.

Thus, the gist of these cases is that a city has the implied power to contract for rates to be charged consumers as a condition of granting consent to the use of its rights-of-way, but that implied power must give way to the state's legislative power to set rates when the state exercises that power.

2

Another group of cases addresses more directly a local unit of government's powers with respect to consent and the imposition of fees for use of rights-of-way.

*Detroit v Detroit United Railway,* 172 Mich 136; 137 NW 645 (1912), involved the fees the city charged the utility for use of the streets, rather than the rates charged customers by the utility. The city had granted the defendant a franchise to operate a street railway. The city alleged that the franchise had expired, and that the city had passed resolutions allowing the defendant to continue to operate only on certain terms, including the payment of $200 a day for the use of the city streets. The defendant continued to operate but did not pay the fee. The city contended that by continuing to operate, the defendant accepted the terms of the resolutions and was compelled to pay the amount due. The city sought to have the defendant enjoined from operating and compelled to remove its equipment, unless it complied

with the resolutions. Relying on the law applicable to landlord and tenant relationships where the tenant holds over after the expiration of the lease, the city argued that it had the right to set the terms for future use of the streets and that the defendant's use of the streets thereafter constituted an acceptance of the terms.

The Court agreed that the franchises had expired. The Court rejected the analogy to the landlord/tenant situation, and found that the defendant did not accept, but had objected to, the rates. The Court further rejected as repugnant to the doctrine that a franchise is a mutual contract, the contention that the city could "arbitrarily," and without consent of the grantee, impose terms on the franchisee. The Court then addressed the defendant's contention that the creation of the Michigan railroad commission took from the municipality the right to locally control the operation of the railway. The defendant argued that street railways were placed on the same footing as general railways and that the franchise from the state was sufficient. The Court stated:

> It is true that the authority to incorporate, to engage in the business of constructing and operating a street railway, to charge tolls for carrying passengers and freight, to occupy the public streets, emanates primarily from the State. The same is true of the fundamental rights of any corporation authorized to exist by the Constitution and laws of this State, but it is also true that all municipalities of this State are given by statute the supervision and reasonable control of all public streets and highways, within their respective limits, and our attention is called to no provision of law to the contrary. This has always been the policy of this State, and in Const. art. 8, § 28, it is provided:
>
> "No person, partnership, association or corporation operating a public utility shall have the right to the use of

the highways, streets, alleys or other public places of any
city, village or township for wires, poles, pipes, tracks or
conduits[,] without the consent of the duly constituted
authorities of such city, village or township; nor to transact
the local business therein without first obtaining a fran-
chise therefor from such city, village or township. The right
of all cities, villages[] and townships to the reasonable
control of their streets, alleys and public places is hereby
reserved to such cities, villages and townships."

The laws authorizing the organization of companies to
operate street railways within municipalities of this State
all have provisions that corporations so organized are not
authorized to enter upon and construct such railways
without the consent of the municipality. The principle of
local self-government has always been fostered in this
State and upheld by this court. While the legislature, in
establishing the Michigan railroad commission and fixing
its powers, has given it certain specified rights relative to
certain street railroads and interurban railways, yet it is
evident from the particular legislation referred to that
there was no legislative intent to reject the established
policy of maintaining local self-government, and to insti-
tute a new policy in derogation thereof. Section 3c, of the
Michigan railroad commission law, among other things,
provides, after giving certain of these powers above re-
ferred to, as follows:

"*Provided further,* that nothing in this act contained
shall apply to street and electric railroads engaged solely in
the transportation of passengers within the limits of cities
or within a distance of five miles of the boundaries
thereof." [3 How. Stat. 2d Ed. § 6526, subd. c.]

The franchises involved in this litigation were all
granted for a period not to exceed 30 years, and were grants
solely for the transportation of passengers, and therefore
come within the express proviso above quoted. It is appar-
ent that the legislature had no intention of providing for
interference by the Michigan railroad commission with the
authority of municipalities over their streets, and the
contention to the contrary is untenable. [*Id.* at 156-158.]

The Supreme Court then determined that the contract

ended when the franchise ended and that the defendant's right to occupy the streets had terminated. The city had the right to compel the defendant to remove its property, but could not unilaterally impose a fee on the defendant. *Id.* at 158-159.

In *Detroit, Wyandotte & Trenton Transit Co v Detroit,* 260 Mich 124; 244 NW 424 (1932), the plaintiffs jitney operators challenged a city ordinance barring the operation of jitneys in Detroit. The circuit court had upheld the ordinances, but had done so before the enactment of 1931 PA 212 and 312. The Court requested briefs on the effect of the state statutes on the validity of the ordinance. The Court quoted Const 1908, art 8, § 28 and stated that the plaintiffs operated public utilities but did not need a franchise from the city because the plaintiffs did not use the streets for wires, poles, pipes, and so forth, nor transact a local business. The Court thus directed its attention to the right of the city to reasonable control of its streets. The Court examined the constitutional debates and statements that the word "reasonable" was inserted to place a limitation on the authority of the municipalities. The city relied on cases stating that the city may prohibit the use of its streets for gain. The Court stated that those cases "must be read in connection with the fact that the cases involved carriers doing a local business and concerned regulatory, not prohibitory, ordinances. The question of the effect of State statutes upon local powers did not arise." *Transit Co, supra,* 260 Mich at 127. The Court determined that by the newly enacted statutes, the state had taken jurisdiction of all carriers of persons or property for hire and had put them under supervision of the Michigan public utilities commission, intending to "occupy the field." The Court continued:

The legislative authority cannot infringe upon the constitutional right of the city to reasonable control of its streets. Nor do Acts Nos. 212 and 312 purport to do so. On the contrary, section 17 of Act No. 212 and section 12 of Act No. 312, expressly preserve such local control. But the enactment of the statutes had the effect of withdrawing from the city all authority over carriers covered by them, except such power as is strictly referable to reasonable control of the streets or as is reserved to it by law. . . .

It is apparent that an ordinance prohibiting the operation of specified kinds of motor vehicle on city streets, the carriers not doing a local business, *prima facie* is an invasion of the State's jurisdiction over them and is invalid.

*        *        *

Methods of operation undoubtedly may become the subject of reasonable regulation by the city. But the number and kind of carriers for hire permitted to engage in nonlocal business are matters upon which the State has taken jurisdiction and are beyond city veto. . . . As framed [the ordinance] bears no relation to the constitutional right of reasonable control of streets, invades the jurisdiction of the State, and is invalid as against carriers doing no local business. [*Id.* at 128-129. Citations omitted.]

Thus, under the reasonable control clause, where the state occupies the field, the city loses all power except as is "strictly referable" to the reasonable control of the streets.

In *People ex rel Maybury v Mut Gas-Light Co of Detroit,* 38 Mich 154 (1878), a case arising before the constitutional provision was adopted, the city sought to file a quo warranto proceeding to deprive the defendant of its franchise, contending that the defendant was in breach of some of the conditions of the franchise. The Court determined that such a proceeding was not contemplated. In discussing the issue, it said:

The statute providing for the incorporation of gas companies allows them to lay pipes through the streets, lanes and squares of any city, . . . where they are located "with the consent of the municipal authorities of said city . . . under such reasonable regulations as they may prescribe." . . .

. . . In the present instance the State has shown by the incorporating act that public policy is not opposed to and is in favor of allowing gas companies to exist, as they only can exist by having power to lay their pipes. The consent of the municipal corporation is required because the terms on which streets may be safely allowed to be occupied for the purposes of laying gas pipes can be best determined by leaving the regulation to be harmonized with all other exigencies by the authorities controlling their use. The law contemplates that permission will not be unreasonably refused or unreasonably burdened, but regards the municipality as competent to determine the proper conditions for itself. [*Id.* at 155.]

*Maybury* was relied on in *Union Twp v Mt Pleasant,* 381 Mich 82; 158 NW2d 905 (1968), where the defendant city sought to lay an additional water pipe connecting it to its water source. It obtained the permission of the county road commission, but not the township through which the road right-of-way ran. The Court determined that notwithstanding the McNitt act, 1931 PA 130, 1948 CL 247.1 *et seq.,* under which the county took over township roads, the defendant was still required under the Constitution to obtain the consent of both jurisdictions. Citing *Maybury,* the Court said:

That on occasion there may be conflict between the county and township when the consent of both is sought, we do not doubt. However, *consent of neither can be refused arbitrarily and unreasonably* and we are not inclined to believe that such refusal need be anticipated. [*Union Twp, supra,* 381 Mich at 90. Emphasis added.]

In *North Star Line, Inc v Grand Rapids,* 259 Mich 654; 244 NW 192 (1932), the Court addressed the plaintiff interurban common carriers' challenge to a Grand Rapids ordinance purporting to regulate and license such carriers. The Court addressed the third clause of the constitutional provision. It stated that subject to the constitutional provision vesting reasonable control of the streets in the cities and villages, the state has control of the highways. The Court analyzed the various provisions of the ordinance to determine if they impermissibly affected the common carriers when they operated outside the city and found that several provisions impermissibly invaded the field of supervision in which the state had chosen to operate. The Court then addressed the city's licensing fee of $15. The Court determined that the amount charged for the license "must be gauged by the expense incurred by the municipality incident to issuing the license and supervising the business the licensee carries on thereunder, if supervision is required" and that a license fee may not be a tax in disguise. *Id.* at 663. The Court determined that in light of the extensive state regulation of the field, the amount of supervision required of the city was almost negligible, and thus the $15 fee was excessive and only a nominal fee would be proper.

The gist of these cases is that where the activity being conducted on a city's rights-of-way is purely local, the city retains broad authority over the terms of its consent, although it may not unilaterally impose a fee after a grant of consent has expired. However, where the Legislature has occupied the field, a city retains only such power as is strictly referable to the reasonable control of its streets, which does not include the power to prohibit the activity; and if the city charges a fee, that fee must be based on the expense to the city of issuing a license and of supervising the activity, if supervision is

required. Even where the consent of the city is required, as where pipe is to be laid in a right-of-way, consent cannot be refused arbitrarily or unreasonably.

D

Guided by these cases, we turn to the question at hand. We reiterate that the issue framed by Dearborn is not whether the state can by statute constitutionally require that a municipality grant consent to a telecommunications company to lay conduit, but whether the state can constitutionally limit its rights under the Constitution by limiting the amount it can charge as a condition of consent.[5] Thus, the city's real complaint is the limitation of the amount of money it is permitted to charge, rather than that the statute compels the city to grant a use permit or consent.

1

We first address the third clause of § 29,[6] the reasonable-control clause. The right to the reasonable control of the streets carries with it the implied power to contract for reasonable terms as a condition of allowing use of the streets. Dearborn may contract for a fee for consent, as it may contract for set rates to be charged its resident consumers. However, this implied power is exercised by entering into contracts with providers, not by unilaterally imposing the terms of the grant of consent. The latter would constitute an at-

[5] Dearborn states the issue: "Whether § 253 of the telecommunications act—providing that local governments may not exact compensation for telephone companies' access to the right-of-way in excess of 'fixed and variable costs'—impinges impermissibly on the grant of authority to local governments in Art VII, § 29 of the constitution."

[6] The second clause of Const 1963, art 7, § 29 is not at issue because TCG does not seek to conduct a local business.

tempt to exercise a state legislative function. Further, the implied power to contract is subject to the superior legislative powers of the state. To be sure, no case specifically says that a local government cannot contract for fees (as distinguished from rates charged to consumers) that conflict with fees set by the state, but we conclude from the cases that a local government may not do so. When focusing on the third clause regarding reasonable control, the source of the power to set fees for use is the same as the source of the power to set rates; it is an implied administrative power based on the right of reasonable control. Neither the power to set fees nor the power to set rates is expressly granted to local units of government. The state's powers are broad, and the local government's powers under the third clause (reasonable control) are subject to the superior powers of the state, even when the rates are otherwise reasonable. Because both powers are implied and the source of the powers is the same, we conclude that there is no reason to distinguish Dearborn's power to set fees under the reasonable-control clause from its power to set rates under that clause. Both are subject to the control of the Legislature.

As with rates, there is no express legislative grant of the power to fix fees other than by contract. Since the Constitution does not expressly grant that right to the cities, it remains with the state, and is subject to the state's control if exercised. Just as the state has the power to set rates, and thereby set the outside parameters of a city's powers to contract, it has the power to set the fees that can be charged nonlocal businesses, and the imposition of a fixed and variable cost fee structure does not impinge on a city's right to the reasonable control of its streets.

2

Focusing on the first clause (consent proviso), the question is whether the state can limit the city's ability to state the terms on which its consent will be granted. The city appears to concede that there is a reasonableness limitation, but argues that that is the extent to which it can be constitutionally limited, i.e., it can charge anything that is reasonable.

We start from the point that even under the consent clause, the power to set fees is an implied permissive contractual authority, and not a broad legislative authority. The city can negotiate a contract setting forth fees, but cannot unilaterally impose a fee pursuant to this clause. *Detroit United Railway, supra.* The city can possibly withhold consent from anyone not willing to pay its fee, but the city cannot withhold consent unreasonably or arbitrarily. Thus, the extent of the city's right is that it may require as a condition of consent that a reasonable fee be paid, and may withhold consent from those who do not agree to pay the reasonable fee.

Dearborn is not claiming here that it ought to be able to withhold consent from TCG because TCG will not agree to pay what Dearborn deems a reasonable fee. That is, Dearborn does not complain that the statute unconstitutionally infringes on its right to exclude telecommunication carriers who will not pay four percent of revenues. Rather, Dearborn asserts that § 253 of the MTA is unconstitutional not because it forces the city to accept the carrier, but because it forecloses the city from insisting on reasonable fees other than a fee determined by the fixed and variable costs. Thus, we must determine whether the right of consent is so broad as to preclude the state from setting the fees a city can charge if it does consent.

By its terms, the consent provision of art 7, § 29 only addresses consent, not the right to charge for that consent. While the authority to so charge through contract has been found to be implied in this provision, it has only been found in the context of a contract agreed to by the parties. Thus, the question becomes whether the implied authority to exact fees through contract is tantamount to an unqualified right to negotiate any fee that can be regarded as reasonable, without legislative constraint on the terms of the fee. That is, does the Constitution guarantee that implied authority against interference by the Legislature? We conclude it does not.

The consent provision does not use the word "reasonable," and does not have the introductory clause "Except as otherwise provided in this constitution." But, while sometimes mentioned, the cases do not seem to rely on either of these qualifications. Rather, the discussion focuses on the nature of municipal and state legislative powers, and the principle that the municipality only has such powers as are expressly granted. Here, what is expressly granted is the right to grant or withhold consent. Even under the first clause, the right to set fees through contract is permissive and implied. Thus, the same analysis that is applied to the third clause would support the conclusion that with respect to the first clause (consent clause), the Legislature can set fees as long as it does not impermissibly infringe on the right to grant or withhold consent. Also, under *North Star Line, supra,* fees that may be imposed pursuant to valid local regulation must be gauged by the expense of such regulation. The standard of fixed and variable costs is consistent with that principle.

III

Dearborn argues that even assuming that § 253 of the MTA constitutionally imposes a limitation on Dearborn's authority to negotiate right-of-way fees in return for its consent, the circuit court misinterpreted § 253 in determining the scope of costs properly included in calculating the limitation imposed by that section. Dearborn argues that limiting it to recovery of the marginal costs specifically assignable to TCG's use of the right-of-way was error.

Statutory interpretation presents a question of law that is reviewed de novo. *Oakland Co Bd of Co Rd Comm'rs v Michigan Prop & Cas Guaranty Ass'n,* 456 Mich 590, 610; 575 NW2d 751 (1998).

A

Contrary to defendant's argument, the circuit court did not limit Dearborn's fee to "incremental" or "marginal" costs, nor did TCG advance such an argument. TCG, rather, advanced the proposition that there must be a substantial nexus or at least a reasonable relationship between the actual maintenance costs incurred by Dearborn and TCG's use of specific public rights-of-way located in Dearborn. TCG did not advance a "marginal" cost theory. The circuit court adhered to language in § 253 tying "fixed and variable costs" to Dearborn's costs in granting a permit and maintaining the rights-of-way used by a provider. TCG objected below when Dearborn attempted at trial to categorize TCG's approach as one of "incremental" or "marginal" costs; the trial court agreed that TCG's expert had not advanced such an approach, and sustained the objection. Dearborn's argument mischaracterizes the proceedings below.[7]

---

[7] We do not agree with our dissenting colleague's characterization of our holding as including "that the trial court properly interpreted and

The only evidence Dearborn submitted at trial regarding its fixed and variable costs was the Plante & Moran "full cost approach" report that concluded that Dearborn spent $37,377,070 (approximately twenty-five percent of its entire budgeted expenditures for all purposes) to "manage" and maintain all its rights-of-way for the year ending June 30, 1998. Dearborn maintained at trial that the second Plante & Moran study, which arrived at a figure of $10,890, was reached by applying a "marginal cost" approach, and that that approach did not accord with the "fixed and variable costs" provision of the statute.

Dearborn's position, as expressed in closing argument, was that it had not apportioned what part of the $37 million dollars TCG could be charged as a fee, but from Dearborn's engineer's trial testimony that there were approximately ten users of rights-of-way in Dearborn, the fee apportionable to TCG would be approximately three million dollars, which Dearborn could reduce in its discretion, but probably would still be in excess of one million dollars. The trial court was not obliged to accept Dearborn's position when Dearborn had not shown that the figures represented the fixed

applied § 253 to require a substantial nexus between the fee defendant charged plaintiff and the costs incurred by defendant to maintain its rights-of way, easements, or public places attributable to use by plaintiff." *Post* at 107-108. We do not adopt a substantial nexus standard, or any particular standard; rather, we hold that the trial court properly focused on the statutory phrase "[a]ny fees . . . shall not exceed the fixed and variable costs to the local unit of government in granting a permit and maintaining the right-of-ways, easements, or public places used by a provider," MCL 484.2253, and that Dearborn did not present evidence addressed to the statutory standard, see section IV, below.

and variable costs to Dearborn in granting a permit and
maintaining the rights-of-way used by TCG.[8]

---

[8] We note in this regard that, under the Metropolitan Extension
Telecommunications Rights-of-Way Oversight Act, MCL 484.3101 *et seq.*,
which took effect November 1, 2002, providers are required to obtain
permits, MCL 484.3105, but the fees providers such as TCG may be
charged for use of public rights-of-way are a small fraction of the fees
Dearborn sought in the instant proceedings.

Section 8 of the new act, MCL 484.3108, provides, in relevant part:

(1) Except as otherwise provided by this act, a provider shall
pay to the authority an annual maintenance fee as required under
this act.

(2) The authority shall determine for each provider the amount
of fees required under this section. April 1 to March 31 shall be the
annual period covered by each assessment and April 29 the date
due for payment. The authority shall prescribe the schedule for the
allocation and disbursement of the fees under this act. The
authority shall disburse the annual maintenance fee to each
municipality . . . on or before the last day of the month following
the month of receipt of the fees by the authority. . . .

(3) Except as otherwise provided under subsection (6), for the
period of November 1, 2002 to March 31, 2003, a provider shall pay
an initial annual maintenance fee to the authority on April 29,
2003 of *2 cents per each linear foot of public right-of-way occupied
by the provider's facilities* within a metropolitan area, prorated for
the period specified in this subsection.

(4) Except as otherwise provided under subsection (6), for each
year after the initial period provided for under subsection (3), a
provider shall pay the authority an annual maintenance fee of 5
cents per each linear foot of public right-of-way occupied by the
provider's facilities within a metropolitan area.

(5) The fee required under this section is based on the linear
feet occupied by the provider regardless of the quantity or type of
the provider's facilities utilizing the public right-of-way or whether
the facilities are leased to another provider.

See also n 1. There is no published case law, and little writing, on the
Metropolitan Extension Telecommunications Rights-of-Way Oversight
Act, MCL 484.3101 *et seq.*, but it was the topic of an address given by

B

Regarding defendant's contention that the court should consider the United States District Court's finding that the fees sought by Dearborn were "fair and reasonable" under the Federal Telecommunications Act, see *TCG Detroit, supra,* 16 F Supp 2d at 788-791, we agree with the circuit court's rejection of this argument:

> The court notes the City's reliance on the opinion rendered in *TCG Detroit* v *City of Dearborn,* . . . the federal companion case to the instant case, in which the Court found that the fees sought by the City were "fair and reasonable." However, that case did not involve the question of whether the fees sought by the City complied with the requirements of § 253 [of the MTA], or were otherwise based exclusively on the City's "fixed and variable costs." Indeed, the Court dismissed all state claims in that case. Hence, the Court's finding is not relevant to the issues presently involved in the case at bar.

C

Dearborn is correct that § 253 does not expressly prescribe the method by which a local government must set its fee. However, because Dearborn did not deter-

---

Michigan Public Service Commission Chairperson Laura Chappelle at the 2002 Communication Policy and Law Symposium at MSU-Detroit College of Law, and was published as a law review article, *Michigan Hi-Speed Internet Plan: Balancing Interests; Moving Ahead,* 2002 MSU-DCL L R 743. Chappelle noted:

> Even though Michigan's former law was ahead of many other states' statutes and the federal requirements in demanding that rights-of-way fees be based on actual costs, some local units of government sought to thwart that mandate and creatively (and not so creatively) insisted on heavy fees. [*Id.,* p 745.]

mine its "fixed and variable costs" as defined in § 253, see section IV below, it cannot be said whether charging TCG four percent of its gross revenues, plus the one-time fee of $50,000, does or does not exceed Dearborn's "fixed and variable costs."

IV

Dearborn also argues that the trial court clearly erred in finding that TCG's evidence of some of Dearborn's costs established its "fixed and variable costs" allowed under the statute. Dearborn argues that TCG introduced evidence relevant only to Dearborn's marginal or incremental costs, and not all of those, and never quantified the dollar amount it was to pay.

Dearborn contends that it was TCG's burden to submit evidence of Dearborn's "fixed and variable costs" under § 253. Our colleague, in partial dissent, concludes that the trial court erred as a matter of law in placing the burden of proof on Dearborn to establish that its proposed fee did not exceed its "fixed and variable costs" under § 253. We do not agree that the trial court so ruled.

The trial court recognized that the burden was on TCG to establish that Dearborn's percentage-of-gross-revenue fee exceeded Dearborn's fixed and variable costs in granting a permit and maintaining the rights-of-way used by TCG. What the trial court did, twice (in a scheduling order and in granting TCG's motion to compel) was order that Dearborn compute and provide to TCG *in discovery* a figure representing its fixed and variable costs in granting TCG a permit and maintaining rights-of-way used by TCG, in order that TCG could then go forward and attempt to meet its burden of proof of showing that Dearborn's proposed fee of four percent gross revenues exceeded Dearborn's "fixed and variable

costs" as provided under § 253. This was not tanta-
mount to a misallocation of the burden of proof.

We do not agree with our dissenting colleague that
the trial court committed error that requires reversal in
excluding Dearborn from presenting expert testimony
in support of its percentage-of-revenue approach at
trial. Defendant's witnesses testified regarding Dear-
born's fixed and variable costs; they were simply pre-
vented from testifying that those costs should be appor-
tioned by way of a percentage-of-revenue approach.
Given the court's pretrial rulings, discussed earlier, its
grant of TCG's motion in limine was proper. See also
section v.

V

Dearborn also argues that the trial court made no
findings regarding the amounts of either the city's
proposed franchise fee or the city's fixed and variable
costs, thus a judgment that the city's proposed fran-
chise fee exceeded its fixed and variable costs is unsup-
ported by proper subordinate findings, contrary to MCR
2.517. We disagree.

The trial court did make findings of fact regarding
"fixed and variable costs" attributable to TCG, both in
its opinion read from the bench, and the judgment, i.e.,
up to $2,500 of documented actual costs for the first
year and up to $500 annually of documented actual
costs thereafter. Further, the trial court found that a fee
of four percent of gross revenues, plus $50,000, as
proposed by Dearborn greatly exceeded its "fixed and
variable costs." The court's findings of fact included:

> The Court: [B]oth parties agree that there are two issues
> that remain. They are, first, what are Dearborn's fixed and
> variable costs in granting a permit and maintaining the

right of ways [sic], easements, and public places used
by . . . TCG Detroit. I want to address that issue first.

TCG has taken the position that the cost of issuing a
permit is at most $2500.00 to the City of Dearborn and that
there is a de minimis amount involved in maintaining the
rights of way which they put at $500.00.

*To date, the City of Dearborn has not given this Court a
specific figure that it believes TCG should pay to get a
permit or to maintain the rights of way. . . .* The City of
Dearborn's whole defense of this case is based on . . . the
cost accumulation theory, and all their witnesses testified
about it with few exceptions. Mr. O'Donnell, Frank Audia
of Plante Moran, Dr. McLean, Mr. Krumm, all basically
subscribed to this cost accumulation theory.

However, their last witness, Mr. Godfrey Udoji, came
down to reality a little bit and began to talk about the
number of users of the right of way and the practicalities of
issuing a permit and maintaining the right of way. But this
really didn't go very far. And the problem I have with the
cost accumulation theory is that most of those costs that
make up that amount really have no relationship to the
cost brought about by TCG.

*The amount that should be shared by TCG and other
users of the right of way the City of Dearborn says is 37
million dollars, almost a quarter of the City's total budget.
And included in that amount is half of the police depart-
ment's budget, a large portion of the 19ᵗʰ District Court's
budget, a large part of the fire department's budget, and I
could go on. . . . . .*

*And during the arguments I asked Mr. Malone [Dear-
born's counsel] what he thought TCG should be paying for
a permit and for maintaining the rights of way, and the
closest he could come to an answer was the 37 million
divided up between ten to twelve users. And the simple math
is that TCG would have to pay at least three million alone
annually for maintaining the right of way. That type of fee
would be illogical and irrational.* And there's some other
adjectives I could use to describe a fee like that, but I don't
need to overmake [sic] my point . . . [.] And the City has

maintained that position throughout this litigation and I totally reject that position out of hand just like Judge Battani did.

Now, there was a separate report that came into evidence that was referred to as the 11K report. . . . [N]either side felt that it was an accurate assessment of costs mentioned in the statute and *both sides rejected it . . . .*

That report placed the cost of issuing a permit and maintaining the right of way at almost $11,000 for the first year. And again, I've got some grave problems with that report also. It attributes a hundred hours of lawyer work to the issuing of the permit and maintaining the right of way the first year. And in essence, that means that a lawyer would spend two and a half weeks solely devoted to issuing a permit and maintaining the d [sic] of way that single year, and this is difficult to buy and I can't accept it.

It likewise includes 50 hours to the building and safety department for a permit and maintenance, and again, that's like one person working a week and a day on the permit and maintenance. And there's other costs that I have serious problems with, and I specifically find that this report involves some inflated figures.

Now, let me shift to plaintiff's case and their witnesses. *The plaintiff's key witness in the Court's opinion was their expert, Mr. Pocalyko, whom I found to be very credible and believable.* I likewise find that I didn't think he was impeached or discredited in any significant way. He was sensible, rational, logical in his analysis and in his applications. His interpretation and view of the law was much more in this Court's opinion practical and realistic. *And I found him more credible not only in the application of a theory of the costs, but also his assessment of costs. And also his practical experience in the real world and his curriculum vitae was extremely impressive and was much more so than the men from academia called by the City of Dearborn. . . . Mr. Pocalyko was highly critical of both the 37 million dollar and the 11K report, and I agree with his analysis on the figures contained in his report.*

So what am I left with here. Plaintiff through Mr. Coy says that the $2500.00 amount that they're seeking the Court to set as the cap was a negotiated fee between TCG and the City of Dearborn. It was what they had originally agreed to as a fee cost for issuing the permit.

Mr. Pocalyko . . . was pretty much in agreement with that figure in his discussion in his report. He stated in his report and I accept that. From all I've seen, realistically, the costs of maintenance of the rights of way that could really be attributable to TCG alone is de minimis. And Mr. Pocalyko set it at $500.00 annually and I accept that also and believe that much has been shown.

Therefore, this Court finds that Plaintiff TCG Detroit has met their burden of proof and shown that the fixed and variable costs to the City of Dearborn do not exceed $2500 for the issuance of a permit, and that the maintenance costs to the City of Dearborn that can be ascribed to TCG Detroit is [sic], quote, "de minimis", unquote, and will be set at up to $500.00 annually. [Emphasis added.]

We agree with Dearborn that the fixed and variable costs are not limited to those that can be specifically attributed to the incremental increase caused by TCG's use of the rights-of-way. Such a concept ignores the inclusion of the term "fixed" costs. Nevertheless, we are satisfied that the trial court did not err in rejecting Dearborn's figures as not reflecting the fixed and variable costs contemplated by the statute. Dearborn included the costs incident to all rights-of-way, easements, and public places. It included amounts attributable to the police department, fire department, and the district court. It did not attempt to narrow the amounts to those attributable to the easements used by TCG, even on a percentage basis, and did not attempt to limit the costs to those legitimately connected to maintaining the easements used by TCG. Faced with Dearborn's figures or TCG's figures, or a figure based on a report that both sides rejected, the court did not err in accepting TCG's expert's figures.

CONCLUSION

We conclude that although it is an open question whether the MTA impermissibly compelled a local unit of government to grant consent in violation of Const 1963, art 7, § 29, that issue is not before us. Dearborn has maintained that the issue is the compensation it may exact from TCG, not whether it can withhold its consent altogether and prevent TCG from any use of its rights-of-way. With regard to this issue, we conclude that Const 1963, art 7, § 29 does not grant a local unit of government the right to be free from legislative limitations on the amount it can charge for the use of its rights-of-way. The right to withhold consent is simply that; it does not include the power to legislate regarding the cost of consent.

Given the manner in which Dearborn advanced a percentage-of-revenue fee approach, i.e., without determining whether four percent of TCG's revenue correlated to TCG's use of the rights-of-way, the court did not err in holding that the percentage-of-revenue fee approach did not meet the requirements of § 253 of the MTA.

Affirmed.

SMOLENSKI, P.J., concurred.

WILDER, J. (*concurring in part and dissenting in part*). I concur and join with the majority in finding that the Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.*, specifically § 253, MCL 484.2253, does not violate the Michigan Constitution, Const 1963, art 7, § 29. I disagree, however, with the majority's conclusion that the trial court properly interpreted and applied § 253 to require a substantial nexus between the fee defendant charged plaintiff and the costs incurred

by defendant to maintain its rights-of-way, easements, or public places attributable to use by plaintiff. Accordingly, I respectfully dissent from sections III, IV, and V of the majority opinion.

Article 2A of the MTA, before its repeal, provided in part:

> (1) Except as provided in subsections (2) and (3), a local unit of government shall grant a permit for access to and the ongoing use of all right-of-ways, easements, and public places under its control and jurisdiction to providers of telecommunication services.
>
> (2) This section shall not limit a local unit of government's right to review and approve a provider's access to and ongoing use of a right-of-way, easement, or public place or limit the unit's authority to ensure and protect the health, safety, and welfare of the public.
>
> (3) A local unit of government shall approve or deny access under this section within 90 days from the date a provider files an application for a permit for access to a right-of-way, easement, or public place. A provider's right to access and use of a right-of-way, easement, or public place shall not be unreasonably denied by a local unit of government. A local unit of government may require as a condition of the permit that a bond be posted by the provider, which shall not exceed the reasonable cost, to ensure that the right-of-way, easement, or public place is returned to its original condition during and after the provider's access and use. [MCL 484.2251.]

"Any conditions of a permit granted under section 251 shall be limited to the provider's access and usage of any right-of-way, easement, or public place." MCL 484.2252. "Any fees or assessments made under section 251 [MCL 484.2251] shall be on a nondiscriminatory basis and shall not exceed the fixed and variable costs to the local unit of government in granting a permit and maintaining the right-of-ways, easements, or public places used by a provider." MCL 484.2253.

Statutory interpretation is a question of law that is considered de novo on appeal. *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich 29, 32; 658 NW2d 139 (2003); *Ross v Michigan,* 255 Mich App 51, 54; 662 NW2d 36 (2003). The rules of statutory interpretation are well-established: The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *Danse Corp v Madison Hts,* 466 Mich 175, 181-182; 644 NW2d 721 (2002). The Legislature is presumed to intend the meaning it plainly expressed. *Guardian Photo, Inc v Dep't of Treasury,* 243 Mich App 270, 276-277; 621 NW2d 233 (2000). "In reviewing the statute's language, every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory." *Wickens v Oakwood Healthcare Sys,* 465 Mich 53, 60; 631 NW2d 686 (2001). However, when the statute's language is clear and unambiguous, judicial construction is neither required nor permitted. *Frankenmuth Mut Ins Co v Marlette Homes, Inc,* 456 Mich 511, 515; 573 NW2d 611 (1998).

As an initial matter, I note my disagreement with the majority's conclusion that plaintiff did not have the burden to prove that the proposed fee, four percent of plaintiff's gross revenues, plus $50,000, exceeded the fixed and variable costs to defendant "in granting a permit and maintaining the rights-of-way, easements, or public places used by a provider." It is well-settled that the "plaintiff has the burden of proof (risk of nonpersuasion) for all elements necessary to establish the case." *Kar v Hogan,* 399 Mich 529, 539; 251 NW2d 77 (1976). Plaintiff alleged that defendant was in violation of the MTA because "[t]he franchise fees [defendant] seeks . . . exceed the fixed and variable costs it would incur as a result of granting a permit to plaintiff . . . and in maintaining the . . . right of way to be used by

plaintiff." Contrary to the finding by the majority, I would conclude that precisely because the statute does not shift the burden of proof to defendant, plaintiff bears the traditional burden of proof of a plaintiff and must establish by a preponderance of the evidence that the fee was in violation of the MTA. I would find that the trial court erred as a matter of law by imposing the burden of proof on the wrong party. *Pickering v Pickering*, 253 Mich App 694, 697; 659 NW2d 649 (2002), citing *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

The majority also concludes that the trial court properly applied the language of § 253 by accepting the proposition advanced by plaintiff that § 253 required defendant to establish a substantial nexus, or at least a reasonable relationship, between the actual maintenance costs incurred by defendant and plaintiff's use of specific public rights-of-way located in defendant city. In finding this interpretation of § 253 to be credible, the majority rejects, as did the trial court, defendant's argument that this interpretation improperly limits the fee to "incremental" or "marginal" costs. I agree with the argument asserted by defendant and would conclude that application of the statute by the trial court was erroneous.

In the business context and in the context of this case, fixed costs are accurately described as costs that do not vary with output. Butler, Economic Analysis for Lawyers, p 920; see also McCain, *Essential Principles of Economics: A Hyperlink Text* <http://william-king.www.drexel.edu/top/prin/EcoToC.html> (1998), ch 8, and <http://william-king.www.drexel.edu/top/prin/txt/cost/cost2.html> (stating that "[f]ixed costs are the costs of the investment goods used by a firm, reflecting a long-term commitment that can only

be recovered by earning out the investment in the production of goods and services for sale"). Thus, fixed costs continue to be incurred as long as the entity incurring the costs remains ongoing and the assets of the entity have alternative uses. See Butler and McCain. Variable costs are defined as costs that vary with the rate of output, and include items such as wages paid to workers and payments for raw materials. Butler, p 936; see also McCain <http://william-king.www.drexel.edu/top/prin/txt/cost/cost2.html> (stating that "[v]ariable costs are costs that can be varied flexibly as conditions change," such as labor costs).

Applied in the context of this case, maintenance of the rights-of-way, easements, and public places in defendant city is a fixed cost. In other words, whether plaintiff (or any other specific company) does business in defendant city, defendant *will* (or at least should) incur certain costs in the maintenance of its rights-of-way, easements, and public places. Because these maintenance costs will be incurred separately and distinctly from any particular additional costs incurred only because plaintiff (or some other provider) chooses to do business in defendant city, these fixed costs may or may not have a particular nexus or relationship to plaintiff's use of the rights-of-way, easements, and public places. Nevertheless, if the subject rights-of-way, easements, and public places in defendant city *are used* by plaintiff in any manner, under the language of § 253 a fee may properly be charged to plaintiff because of this usage. The statute requires that the fee be nondiscriminatory, suggesting that the costs reflected in the fee may not be unfairly allocated among the various users of the rights-of-way, easements, and public places. The statute contains no language, however, that requires the fee to be based solely on the costs directly incurred because the provider seeks a permit or uses the rights-of-way, ease-

ments, and public places. In my judgment, the statutory scheme allows the charging of a fee that is based not just on the *cost attributed to* a particular use of the rights-of-way, easements, and public places by a particular provider, but more broadly encompasses the *costs of maintaining* the rights-of-way, easements, and public places used by the provider.

Defendant argued in this Court and at the trial court that as a matter of economics, accounting, and statutory application, the fixed costs it incurred to maintain rights-of-way, easements, and public places are properly allocated on a proportional basis to plaintiff under § 253. The trial court rejected this assertion, and the evidence to support it, on the ground that "those costs that make up that amount really have no relationship to the *cost brought about by TCG.*" (Emphasis added.) While the majority affirms this conclusion, I would find that the trial court erred. The trial court's ruling is inconsistent with the language of § 253, which does not limit the fee to only an amount having a specific nexus or relationship to the additional costs incurred when the provider seeks a permit. As contended by defendant, such a fee reflects only the marginal costs in processing the permit, i.e., the cost of the additional inputs needed to produce the new output, Butler, *supra,* p 927, and not the fixed and variable costs designated in the statute.

The majority acknowledges that the term "fixed and variable costs" entails more than the incremental or marginal costs attributed to plaintiff's use of the rights-of-way, easements, and public places maintained by defendant city, but concludes nonetheless that defendant's proofs failed to show how all its costs incident to maintaining its rights-of-way, easements, and public places could be properly attributable to plaintiff. As I stated previously, however, the burden of proof should rest with plaintiff, and not defendant. Additionally, the

trial court accepted as credible expert testimony presented by plaintiff that the majority acknowledges is suspect. Unlike the majority, I would find that the trial court clearly erred in finding on the basis of this testimony that defendant's fixed and variable costs attributable to plaintiff, "w[ere] de minimis."[1]

Moreover and equally as important, the trial court precluded by way of a ruling in limine relevant expert testimony on the subject of cost apportionment through which defendant purported to explain why and how all defendant's fixed and variable costs, including costs attributable to the police and fire departments and the district court, should be considered when determining whether the fee exceeds defendant's fixed and variable costs. Defendant's theory of the case was that its proposed fee, based on a percentage of plaintiff's revenues, did not exceed the fixed and variable costs of maintaining its rights-of-way, easements, and public places, and that the fee appropriately reflected costs properly apportioned to plaintiff. I would find that the trial court abused its discretion in excluding the relevant evidence that defendant offered in support of this contention.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Waknin v Cham-*

---

[1] In agreeing with the trial court's finding on this issue, the majority notes that under the Metropolitan Extension Telecommunications Rights-of-Way Oversight Act, 2002 PA 48, MCL 484.3101 *et seq.*, the fees providers such as TCG may be charged for use of public rights-of-way are a small fraction of the fees Dearborn sought in this case. The majority further cites the comments of Laura Chappelle, former Michigan Public Service Commission Chairperson, that, in her view, the fees charged by certain municipalities sought to thwart the legislative intent of § 253 of the MTA that fees be based on actual costs. However, perhaps it is instructive in our construction of § 253 that the Legislature did *not* use the term of art "fixed and variable costs" when it enacted MCL 484.3108, but rather established by statute a fixed price to be charged by the municipality.

*berlain*, 467 Mich 329, 334; 653 NW2d 176 (2002). Ordinarily, we find that the trial court has abused its discretion "only in the extreme case where the result is so palpably and grossly contrary to fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias, or where an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made." *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003) (citations omitted). A trial court's erroneous decision to admit or exclude evidence will not warrant reversal unless a substantial right of a party is affected, MRE 103, and it affirmatively appears that the failure to grant such relief is inconsistent with substantial justice. MCR 2.613(A); *Lewis, supra*.

In the present case, I would conclude that the exclusion of the evidence warrants reversal. The excluded evidence is highly relevant to: (1) the calculation of defendant's fixed and variable costs within the meaning of the statute; (2) whether costs attributed to the police and fire departments and the courts are properly included in this calculation; and (3) whether the proposed fee exceeds those fixed and variable costs properly attributable to plaintiff. The trial court's exclusion of the evidence prevented defendant from presenting critical evidence in support of its theory of the case. I would find that it is inconsistent with substantial justice, and thus significantly affecting defendant's substantial rights, to affirm the trial court's ruling on the basis that there was insufficient evidence to support defendant's assertion of its fixed and variable costs, the insufficiency of which stems from the trial court's ruling precluding the admission of such evidence.

For the reasons stated above, I join with the majority opinion in finding that the Michigan MTA, specifically § 253, does not violate the Michigan Constitution, Const 1963, art 7, § 29. I would reverse and remand for a new trial with regard to, and therefore respectfully dissent from, sections III, IV, and V of the majority opinion.